## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM, *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> FEDERAL HOUSING FINANCE AGENCY, *et al.* <br><br> Defendants. | Civil Action No. 1:11-cv-01543 (RJL) |

### PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(a), Plaintiffs respectfully move for summary judgment on all counts of their complaint. As explained more fully in the accompanying Memorandum of Points and Authorities, the final rule of the Federal Housing Finance Agency ("FHFA"), *Conservatorship and Receivership*, 76 Fed. Reg. 35,724 (June 20, 2011), is invalid in its entirety because it was promulgated by an agency whose head was not appointed in the manner required by the Appointments Clause, U.S. Const. art. II, § 2, and the Housing and Economic Recovery Act of 2008 (the "Act"), Pub. L. No. 110-289, 122 Stat. 2654.

As further explained in the accompanying Memorandum, the provisions of the FHFA's final rule that (1) subordinate securities fraud claims to the lowest level of priority in receivership, 12 C.F.R. § 1237.9(a); and (2) prohibit Fannie Mae from paying such claims during conservatorship absent the Director's consent, 12 C.F.R. §§ 1237.12(a), .13(a); are invalid because they are arbitrary, capricious, an abuse of discretion, and not in accordance with law; because they are contrary to the Constitution; and because they exceed the FHFA's authority. Among other things, the provision subordinating securities fraud claims in receivership conflicts

with the governing statute and Supreme Court precedent, while the provisions prohibiting payment of securities fraud claims in conservatorship rest on that unlawful priority scheme for receivership and exceed the agency's authority under the statute.  Neither rule is supported by reasoning sufficient to withstand review under the Administrative Procedure Act.  Finally, even if the governing statute were ambiguous—and it is not—none of the foregoing provisions is a permissible construction of the statute because each raises serious constitutional questions.

A proposed order is attached.

Dated:  December 9, 2011

Respectfully submitted,

MICHAEL DeWINE
OHIO ATTORNEY GENERAL

   /s/ Jeffrey A. Lamken    

| | |
|---|---|
| Joseph T. Deters (admitted *pro hac vice*) | Jeffrey A. Lamken (D.C. Bar # 440547) |
| W.B. Markovits (admitted *pro hac vice*) | Robert K. Kry (D.C. Bar # 490545) |
| WAITE, SCHNEIDER, BAYLESS & | MOLO LAMKEN LLP |
|    CHESLEY CO., L.P.A. | The Watergate, Suite 660 |
| One West Fourth Street | 600 New Hampshire Avenue, N.W. |
| Cincinnati, Ohio  45202 | Washington, D.C.  20037 |
| (513) 621-0267 (telephone) | (202) 556-2000 (telephone) |
| (513) 621-0262 (facsimile) | (202) 556-2001 (facsimile) |

*Attorneys for Plaintiffs Ohio Public Employees Retirement System, et al.*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>FEDERAL HOUSING FINANCE AGENCY, *et al.*<br><br>Defendants. | Civil Action No. 1:11-cv-01543 (RJL) |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

MICHAEL DeWINE
OHIO ATTORNEY GENERAL

Joseph T. Deters (admitted *pro hac vice*)
W.B. Markovits (admitted *pro hac vice*)
WAITE, SCHNEIDER, BAYLESS &
  CHESLEY CO., L.P.A.
One West Fourth Street
Cincinnati, Ohio  45202
(513) 621-0267 (telephone)
(513) 621-0262 (facsimile)

Jeffrey A. Lamken (D.C. Bar # 440547)
Robert K. Kry (D.C. Bar # 490545)
MOLO LAMKEN LLP
The Watergate, Suite 660
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
(202) 556-2000 (telephone)
(202) 556-2001 (facsimile)

*Attorneys for Plaintiffs Ohio Public Employees Retirement System, et al.*

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

STATEMENT ................................................................................................................. 1

I.      The Fraud at Fannie Mae ...................................................................................2

II.     The FHFA's Authority Under the Housing and Economic Recovery Act .........4

        A.      The FHFA's Structure and Broad Regulatory Powers ...........................5

        B.      The Director's Powers as Conservator or Receiver ...............................5

III.    The Challenged Rule ...........................................................................................7

        A.      The Acting Director's Appointment Without Senate Confirmation ........7

        B.      The Notice of Proposed Rulemaking .....................................................7

        C.      The Final Rule .......................................................................................8

SUMMARY OF ARGUMENT ................................................................................... 11

ARGUMENT ................................................................................................................ 12

I.      The FHFA's Rule Is Invalid Because the Agency's Head Is Serving in Violation
        of the Appointments Clause ..............................................................................13

        A.      The Appointments Clause Requires Principal Officers To Be Confirmed
                by the Senate .......................................................................................13

        B.      Mr. DeMarco Is Serving Without Senate Confirmation in Violation of the
                Appointments Clause ...........................................................................14

        C.      The Appointments Clause Cannot Be Circumvented by Designating an
                "Acting" Director Who Holds Office Indefinitely .................................16

        D.      Mr. DeMarco's Designation Was Also Independently Invalid Because His
                Predecessor's Appointment Was Unconstitutional ...............................23

II.   The Rule's Attempt To Revise the Statutory Priority Scheme for Receivership Is Unlawful ....................................................................................................................24

    A.   *Oppenheimer* Requires Defrauded Investors To Be Treated As Creditors Unless Congress Expressly Provides Otherwise.....................................................24

    B.   Bankruptcy Law Undermines the FHFA's Rule....................................................28

    C.   The FHFA's Attempts To Distinguish *Oppenheimer* Fail....................................31

    D.   The Act's History Confirms That Congress Did Not Intend To Authorize Subordination of Securities Fraud Claims ..............................................................32

    E.   The FHFA's Arbitrary Policy Arguments Cannot Redeem Its Rule ....................35

III.   The Rule's Prohibition on Payments in Conservatorship Is Unlawful .............................37

    A.   The Prohibition on Payments in Conservatorship Falls Together with the Agency's Unlawful Subordination Scheme...........................................................37

    B.   The Non-Payment Provisions Exceed the Agency's Authority and Arbitrarily Single Out Securities Fraud Claims.....................................................38

    C.   The FHFA's Contrary Arguments Lack Merit .....................................................40

IV.   Principles of Constitutional Avoidance Foreclose the FHFA's Rule ...............................42

    A.   The Rule Violates Due Process.............................................................................42

    B.   The Rule Violates Separation of Powers ..............................................................43

    C.   The Rule Violates the Takings Clause..................................................................44

CONCLUSION...............................................................................................................................45

## TABLE OF AUTHORITIES[1]

Page

### CASES

*Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359 (1998) .......................................36, 37

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....................................................................12

*Bourgeois v. A.P. Green Indus., Inc.*, 783 So. 2d 1251 (La. 2001) ...............................................42

*Buckley v. Valeo*, 424 U.S. 1 (1976) .........................................................................................14, 23

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) ...........................................31, 39

*Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395 (D.C. Cir. 2004)...................................24

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994).........31

*Chamber of Commerce of U.S. v. FEC*, 69 F.3d 600 (D.C. Cir. 1995) ........................................42

*Chevron U.S.A., Inc. v. Nat. Resources Def. Council, Inc.*, 467 U.S. 837 (1984)..................24, 42

*Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103 (1948)................................43

*Clark v. Boston-Cont'l Nat'l Bank*, 84 F.2d 605 (1st Cir. 1936)..................................................26

*Crane v. Hahlo*, 258 U.S. 142 (1922) ...........................................................................................42

*Dorszynski v. United States*, 418 U.S. 424 (1974)........................................................................27

*E. Enters. v. Apfel*, 524 U.S. 498 (1998)......................................................................................42

*Edmond v. United States*, 520 U.S. 651 (1997) ...............................................................13, 14, 15

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
    485 U.S. 568 (1988)..................................................................................................................42

*Edwardsen v. Morton*, 369 F. Supp. 1359 (D.D.C. 1973) ...........................................................44

*Evans v. United States*, 504 U.S. 255 (1992)................................................................................33

*FDIC v. Jenkins*, 888 F.2d 1537 (11th Cir. 1989) ...............................................................34, 35

*FEC v. NRA Political Victory Fund*, 6 F.3d 821 (D.C. Cir. 1993) ..............................................16

---

[1] Authorities upon which this memorandum chiefly relies are marked with asterisks.

*Fin. Planning Ass'n v. SEC*, 482 F.3d 481 (D.C. Cir. 2007) ........................................24

*First Empire Bank–New York v. FDIC*, 572 F.2d 1361 (9th Cir. 1978).........................30

*Fla. Land & Imp. Co. v. Merrill*, 52 F. 77 (5th Cir. 1892) ...........................................27

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 130 S. Ct. 3138 (2010)..............15

*Freytag v. Comm'r*, 501 U.S. 868 (1991) ..................................................................13

*Gaff v. FDIC*, 919 F.2d 384 (6th Cir. 1990), *modified*,
   933 F.2d 400 (6th Cir. 1991) .............................................................28, 30, 34, 35

*Gen. Motors Corp. v. Romein*, 503 U.S. 181 (1992) ...................................................42

*Greenfield v. Shuck*, 867 F. Supp. 62 (D. Mass. 1994)................................................34

*Greyhound Food Mgmt., Inc. v. City of Dayton*, 653 F. Supp. 1207 (S.D. Ohio 1986),
   *aff'd*, 852 F.2d 866 (6th Cir. 1988) ....................................................................44

*\*Hayes v. Gross*, 982 F.2d 104 (3d Cir. 1992) ........................................................34, 35

*\*Howard v. Haddad*, 916 F.2d 167 (4th Cir. 1990).................................................34, 35

*In the Matter of Stirling Homex Corp.*, 579 F.2d 206 (2d Cir. 1978)............................31

*In re Aircrash in Bali, Indonesia on April 22, 1974*, 684 F.2d 1301 (9th Cir. 1982)...................44

*In re Commercial Fin. Servs., Inc.*, 268 B.R. 579 (Bankr. N.D. Okla. 2001) ..............30

*In re Fannie Mae Sec. Litig.*, 552 F.3d 814 (D.C. Cir. 2009)......................................4

*In re Geneva Steel Co.*, 281 F.3d 1173 (10th Cir. 2002) ............................................30

*In re Telegroup, Inc.*, 281 F.3d 133 (3d Cir. 2002) ...................................................30

*Kilpatrick v. Riddle*, 907 F.2d 1523 (5th Cir. 1990)...................................................27

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) .............................................44

*Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992)...............................................44

*Mathews v. Eldridge*, 424 U.S. 319 (1976)...............................................................43

*N. Star Steel Co. v. Thomas*, 515 U.S. 29 (1995).......................................................28

*Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702 (D.C. Cir. 2008).............................42

*Nat'l Mining Ass'n v. U.S. Dep't of the Interior*, 105 F.3d 691 (D.C. Cir. 1997) .......................37

*Nw. Racquet Swim & Health Clubs, Inc. v. Resolution Trust Corp.*, 927 F.2d 355
  (8th Cir. 1991)..............................................................................................32

*Office & Prof'l Emps. Int'l Union v. FDIC*, 962 F.2d 63 (D.C. Cir. 1992)............................28, 30

*\*Olympic Fed. Sav. & Loan Ass'n v. Dir., Office of Thrift Supervision,*
  732 F. Supp. 1183 (D.D.C. 1990), *appeal dismissed as moot*, 903 F.2d 837
  (D.C. Cir. 1990) ...............................................................................17, 18, 23

*\*Oppenheimer v. Harriman Nat'l Bank & Trust Co.*, 301 U.S. 206 (1937)........................ *passim*

*Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978)............................................45

*Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995)......................................................44

*Propert v. Dist. of Columbia*, 948 F.2d 1327 (D.C. Cir. 1991) ....................................................43

*Resolution Trust Corp. v. Fleischer*, 892 P.2d 497 (Kan. 1995) ................................................42

*Richardson v. Olivier*, 105 F. 277 (5th Cir. 1900)................................................................26, 31

*Rosa v. Resolution Trust Corp.*, 938 F.2d 383 (3d Cir. 1991) ......................................................41

*Ryder v. United States*, 515 U.S. 177 (1995) ...................................................................16

*S.C. Pub. Serv. Auth. v. FERC*, 850 F.2d 788 (D.C. Cir. 1988) ..................................................38

*Salter v. Williams*, 244 F. 126 (3d Cir. 1917)..................................................................26

*SEC v. Ins. Investors Trust Co.*, No. 5753, 1971 WL 953 (W.D. Ky. Oct. 29, 1971)..................27

*Solite Corp. v. EPA*, 952 F.2d 473 (D.C. Cir. 1991).............................................................37

*Transmission Agency of N. Cal. v. FERC*, 495 F.3d 663 (D.C. Cir. 2007) ...................................38

*United States v. Eaton*, 169 U.S. 331 (1898)....................................................................19

*United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978)..........................................................27

*Weiss v. United States*, 510 U.S. 163 (1994) ...................................................................14

*Williams v. Green*, 23 F.2d 796 (4th Cir. 1928) ................................................................27

*\*Williams v. Phillips*, 360 F. Supp. 1363 (D.D.C. 1973)......................................................16, 17

*\*Williams v. Phillips*, 482 F.2d 669 (D.C. Cir. 1973)..........................................................17, 20

## CONSTITUTIONAL PROVISIONS, STATUTES, AND RULES

U.S. Const. art. II, § 2 ...................................................................................... *passim*

U.S. Const. amend. V ...............................................................................12, 42, 44

Financial Institutions Reform, Recovery, and Enforcement Act of 1989,
    Pub. L. No. 101-73, 103 Stat. 183 ...............................................................33, 34

Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289,
    122 Stat. 2654 ........................................................................................... *passim*

5 U.S.C. § 3346 ...........................................................................................23

5 U.S.C. § 3346(a)(1) ..................................................................................21

11 U.S.C. § 510(b) ............................................................9, 28, 29, 30, 31

12 U.S.C. § 1821(c) .....................................................................................32

12 U.S.C. § 1821(d) .....................................................................................32

12 U.S.C. § 4511(a) .......................................................................................5

12 U.S.C. § 4512(b)(1) ..................................................................................5

12 U.S.C. § 4512(b)(2) .....................................................................5, 15, 21

12 U.S.C. § 4512(b)(5) .....................................................................5, 22, 23

12 U.S.C. § 4512(f) ............................................................................5, 23

12 U.S.C. § 4513(a)(1)(A) ............................................................................5

12 U.S.C. § 4514(a)(1) ..................................................................................5

12 U.S.C. § 4514(c)(2)(C) .............................................................................5

12 U.S.C. § 4517(a) .......................................................................................5

12 U.S.C. § 4517(b) .......................................................................................5

12 U.S.C. § 4517(g) .......................................................................................5

12 U.S.C. § 4518 ...........................................................................................5

12 U.S.C. § 4541(a) .......................................................................................5

12 U.S.C. § 4617(a) .....................................................................................32

12 U.S.C. § 4617(a)(1)................................................................................................5

12 U.S.C. § 4617(b)................................................................................................32

12 U.S.C. § 4617(b)(1)............................................................................................7

12 U.S.C. § 4617(b)(2)(B)......................................................................................38

12 U.S.C. § 4617(b)(2)(B)(i)..............................................................................6, 38

12 U.S.C. § 4617(b)(2)(B)(iv)..................................................................................6

12 U.S.C. § 4617(b)(2)(D)..................................................................................6, 38

12 U.S.C. § 4617(b)(2)(D)(i)..................................................................................40

12 U.S.C. § 4617(b)(2)(D)(ii).................................................................................40

12 U.S.C. § 4617(b)(2)(E)........................................................................................6

12 U.S.C. § 4617(b)(2)(H)..................................................................................6, 38

12 U.S.C. § 4617(b)(11)(C)....................................................................................39

12 U.S.C. § 4617(c)(1).............................................................................6, 7, 25, 39

12 U.S.C. § 4617(c)(1)(B)................................................................................25, 27

12 U.S.C. § 4617(c)(1)(D)................................................................................25, 27

12 U.S.C. § 4617(j)(3)............................................................................................40

Fed. R. Civ. P. 56(a) ..............................................................................................12

## LEGISLATIVE MATERIALS

H.R. Rep. No. 95-595 (1978)...................................................................................29

H.R. Rep. No. 110-142 (2007).................................................................................32

S. 774, 101st Cong., 1st Sess. § 214(o)(1) (1989) ..................................................33

135 Cong. Rec. 18,571 (1989).................................................................................33

135 Cong. Rec. 18,575 (1989).................................................................................34

## EXECUTIVE MATERIALS

12 C.F.R. § 1229.13(3) ........................................................................................9

12 C.F.R. § 1237.9(a).................................................................................. *passim*

12 C.F.R. § 1237.12(a)................................................................................ *passim*

12 C.F.R. § 1237.13(a)................................................................................ *passim*

*Conservatorship and Receivership*, 75 Fed. Reg. 39,462 (July 9, 2010) ......................................7

*Conservatorship and Receivership*, 76 Fed. Reg. 35,724 (June 20, 2011).......................... *passim*

*Department of Energy—Appointment of Interim Officers—Department of Energy
   Organization Act (42 U.S.C. § 7342)*, 2 Op. Off. Legal Counsel 405 (1978) ............19, 20, 22

*Designation of Acting Director of the Office of Management and Budget*,
   2003 WL 24151770 (O.L.C. June 12, 2003) ...................................................19, 20

*In the Matter of Four Seasons Nursing Ctrs. of Am., Inc.*, SEC Release No. CR-310,
   1972 WL 129648 (Mar. 16, 1972)...........................................................................29

*Status of the Acting Director, Office of Management and Budget*, 1 Op. Off. Legal
   Counsel 287 (1977)..................................................................18, 19, 20, 21, 22

*The Constitutional Separation of Powers Between the President and
   Congress*, 20 Op. Off. Legal Counsel 124 (1996) ...............................19, 20, 22, 23

## OTHER AUTHORITIES

Richard Scott Carnell, *Handling the Failure of a Government-Sponsored Enterprise*,
   80 Wash. L. Rev. 565 (2005).................................................................................39

Kenneth B. Davis, Jr., *The Status of Defrauded Securityholders in Corporate Bankruptcy*,
   1983 Duke L.J. 1 ..................................................................................................36

*The Federalist No. 76* (Henry B. Dawson ed., 1864) ...................................................14

Memorandum for the Securities and Exchange Commission, *Protective Comm. v.
   Anderson*, 390 U.S. 414 (filed March 1967)..........................................................29

John J. Slain & Homer Kripke, *The Interface Between Securities Regulation and
   Bankruptcy*, 48 N.Y.U. L. Rev. 261 (1973)......................................................29, 30

Robert J. Stark, Reexamining the Subordination of Investor Fraud Claims in Bankruptcy,
   72 Am. Bankr. L. J. 497 (1998) ............................................................................30

## INTRODUCTION

To protect the public and ensure evenhanded administration of the laws, the Appointments Clause requires that principal officers be nominated by the President and confirmed by the Senate. This case concerns the exercise of extraordinary power by an officer serving in violation of that mandate. Led by an "Acting Director" who has served without Senate confirmation for more than two years, the Federal Housing Finance Agency ("FHFA") has promulgated arbitrary regulations designed to single out one group of Fannie Mae's creditors—the victims of Fannie Mae's massive securities fraud—and frustrate their ability to recover their losses. Having collected millions of dollars (through its predecessor) on its own fraud claims against Fannie Mae, the FHFA now seeks to subordinate securities fraud claims to the lowest level of priority in any future receivership, behind all other creditor claims. The rule also singles out securities fraud claims for non-payment during the current conservatorship absent the Acting Director's consent. The Acting Director has announced that he will not authorize such payments—even for claims reduced to judgment by this Court—so he can reserve Fannie Mae's assets for its "preferred shareholder," the U.S. government.

That new rule cannot be sustained. It was promulgated by an agency whose head holds office in plain violation of the Appointments Clause. It contravenes Supreme Court precedent that requires securities fraud claims to be treated on par with other creditor claims in receivership. It exceeds the agency's powers in conservatorship. And it raises serious constitutional concerns. For all those reasons, Plaintiffs are entitled to summary judgment.

## STATEMENT

This case challenges the FHFA's new rule purporting to subordinate securities fraud claims against Fannie Mae in receivership and to prohibit payment of such claims in conservatorship. Plaintiffs are Ohio state pension funds that invested in Fannie Mae's common stock and

have been appointed lead plaintiffs in a securities fraud class action currently pending in this Court.  *See In re Fannie Mae Sec. Litig.*, Consol. Civ. No. 1:04-cv-01639 (D.D.C.); AR 22.  The class they represent includes pension funds throughout all 50 States representing more than 30 million pensioners, as well as other individual investors.  Declaration of W.B. Markovits ("Markovits Decl.") ¶ 1; AR 23.  Defendants are the FHFA and its Acting Director, Edward DeMarco.

## I.      THE FRAUD AT FANNIE MAE

This Court is by now familiar with the fraud claims against Fannie Mae.  As explained in the complaint and summary judgment briefs in that case, Fannie Mae manipulated its reported earnings for years to show stable, steady growth while falsely touting itself as a conservative investment.  Markovits Decl. Ex. A ¶¶ 2, 34.  To maintain that illusion, Fannie Mae violated generally accepted accounting principles ("GAAP"), engaged in other accounting manipulations, and maintained weak or non-existent internal controls so the fraud would not be discovered.  *Id.* ¶¶ 34, 40-43, 54-55.  Fannie Mae's violations allowed its senior officers to increase their compensation by appearing to meet earnings targets each period.  *Id.* ¶¶ 186-201.  When the fraud was revealed, the company's stock price plunged, and investors suffered billions of dollars in losses.  *Id.* ¶ 455; Markovits Decl. Ex. B at 32; *see also* AR 22-23, 50-51.

Fannie Mae's fraud was investigated by the U.S. Attorney's Office, the Securities and Exchange Commission ("SEC"), and the FHFA's predecessor, the Office of Federal Housing Enterprise Oversight ("OFHEO").  Markovits Decl. Ex. C at 1-4.  In September 2004, OFHEO released a report citing "concerns regarding the validity of previously reported financial results, the adequacy of regulatory capital, the quality of management supervision, and the overall safety and soundness" of Fannie Mae.  Markovits Decl. Ex. D at i.  The SEC's Office of the Chief Accountant determined that Fannie Mae had violated accounting standards Fannie Mae itself had designated "critical" or "significant."  Markovits Decl. Ex. E, Ex. F at 39-40, 126-27.  Fannie

Mae's Board of Directors commissioned former Senator Warren Rudman to head an independent investigation.  Markovits Decl. Ex. G at 1.  He found that "management's accounting practices in virtually all of the areas that [he] reviewed were not consistent with GAAP, and, in many instances, management was aware of the departures from GAAP."  *Id.* at 4.  Fannie Mae's Board of Directors promptly "accept[ed] and embrace[d]" those findings.  Markovits Decl. Ex. H at 2.

In May 2006, OFHEO produced a final, lengthy report of its investigation.  Markovits Decl. Ex. I.  The report's summary provides a concise overview of the fraud and its aftermath:

- "Fannie Mae senior management promoted an image of the Enterprise as one of the lowest-risk financial institutions in the world and as 'best in class' in terms of risk management, financial reporting, internal control, and corporate governance," but "risks at Fannie Mae were greatly understated" and "the image was false."

- Fannie Mae's reported profit growth and achieved earnings targets "were illusions deliberately and systematically created by [Fannie Mae's] senior management with the aid of inappropriate accounting and improper earnings management."

- "A large number of Fannie Mae's accounting policies and practices did not comply with Generally Accepted Accounting Principles (GAAP)."

- Fannie Mae "had serious problems of internal control, financial reporting, and corporate governance."

- "By deliberately and intentionally manipulating accounting to hit earnings targets, senior management maximized the bonuses and other executive compensation they received, at the expense of shareholders."

*Id.* (summary page).

In December 2006, Fannie Mae restated its financial results, wiping out $6.3 billion of reported earnings.  Markovits Decl. Ex. C at 2.  Acknowledging dozens of accounting violations, the company conceded that its "misapplications of GAAP resulted in material modifications to [its] financial statements."  Markovits Decl. Ex. C at 74-87, 201-02.  Fannie Mae's accounting policies for "nearly every major accounting standard applicable to [its] mortgage financing business" were "not compliant with GAAP."  Markovits Decl. Ex. J ¶ 5 (emphasis omitted).  The re-

sulting restatement was "one of the largest financial restatements in U.S. corporate history." Markovits Decl. Ex. K ¶ 10.

On November 19, 2004, Plaintiffs filed suit against Fannie Mae and three of its senior officers in the U.S. District Court for the Southern District of Ohio. *Ohio Pub. Emps. Ret. Sys. v. Fannie Mae*, No. 2:04-cv-01106 (S.D. Ohio). Claims arising out of Fannie Mae's fraud were then consolidated in this Court as *In re Fannie Mae Securities Litigation*, Consol. Civ. No. 1:04-cv-01639 (D.D.C.). That action has now been pending for seven years—largely due to delays caused by the FHFA's predecessor. *See, e.g.*, *In re Fannie Mae Sec. Litig.*, 552 F.3d 814 (D.C. Cir. 2009) (affirming contempt sanctions). Over 67 million pages of documents have been produced; 123 fact depositions and 35 expert depositions have been taken; and eight summary judgment motions have been filed. Markovits Decl. ¶ 2. As this Court has noted, the action "has been regarded and referred to as the largest accounting fraud case in the history of the United States." Markovits Decl. Ex. L at 173.

Meanwhile, in 2006, the SEC filed its own securities fraud lawsuit against Fannie Mae based on the same fraud. *See SEC v. Fed. Nat'l Mortg. Ass'n*, No. 1:06-cv-00959 (D.D.C.). Fannie Mae paid the SEC a civil penalty of $350 million to settle those claims, and paid OFHEO a further $50 million. Markovits Decl. Ex. M attach. 2, art. XI, at 14. Three of Fannie Mae's senior officers also paid settlements valued at over $30 million. Markovits Decl. Ex. N at 2.

## II.   THE FHFA'S AUTHORITY UNDER THE HOUSING AND ECONOMIC RECOVERY ACT

Responding to the need for better oversight, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA" or "the Act"). Pub. L. No. 110-289, 122 Stat. 2654. The Act created the FHFA to supervise Fannie Mae, Freddie Mac, and the Federal Home Loan Banks.

### A.     The FHFA's Structure and Broad Regulatory Powers

The FHFA is an "independent" federal agency, 12 U.S.C. § 4511(a), headed by a Director who "shall be appointed by the President, by and with the advice and consent of the Senate," *id.* § 4512(b)(1).  The Director serves a five-year term, subject only to for-cause removal by the President.  *Id.* § 4512(b)(2).  The Act provides that, "[i]n the event of the death, resignation, sickness, or absence of the Director, the President shall designate" one of the agency's three Deputy Directors "to serve as acting Director until the return of the Director, or the appointment of a successor."  *Id.* § 4512(f).  It also includes a "[t]ransitional provision" under which "the person serving as the Director of [OFHEO]" would become the FHFA's first Director until his successor was appointed.  *Id.* § 4512(b)(5).

As head of the FHFA, the Director wields broad regulatory powers.  He "oversee[s] the prudential operations of each regulated entity"—Fannie Mae, Freddie Mac, and the Federal Home Loan Banks.  12 U.S.C. § 4513(a)(1)(A).  He may require those entities to submit reports on their financial condition or operations (subject to fines of up to $1,000,000 per day for non-compliance).  *Id.* § 4514(a)(1), (c)(2)(C).  He directs audits of their records, *id.* § 4517(a), (b), (g), exercises substantial control over their officers' salaries, *id.* § 4518, and decides whether to approve any financial product they seek to offer to the public, *id.* § 4541(a).  The Director thus wields substantial control over trillions of dollars of mortgage-related securities and a significant sector of the U.S. economy.  AR 335.

### B.     The Director's Powers as Conservator or Receiver

In addition to those supervisory powers, the Act gives the FHFA authority to place the regulated entities into conservatorship or receivership and to act as conservator or receiver for them.  12 U.S.C. § 4617(a)(1).  Once the FHFA places an entity into conservatorship or receivership, it can "take over the assets of and operate the regulated entity" with all the powers of its

shareholders, directors, and officers, and can seek to "preserve and conserve the assets and property of the regulated entity." *Id.* § 4617(b)(2)(B)(i), (iv).  The Act, however, carefully distinguishes between the FHFA's powers as receiver and its powers as conservator.

*Receivership.*  As receiver, the FHFA places the regulated entity in liquidation and proceeds to realize and distribute its assets among those with claims against it.   12 U.S.C. § 4617(b)(2)(E).  The Act contains a mandatory priority scheme for unsecured claims in receivership.  Claims "shall have priority in the following order":

> (A) Administrative expenses of the receiver.

> (B) ***Any other general or senior liability of the regulated entity*** (which is not a liability described under subparagraph (C) or (D)).

> (C) Any obligation subordinated to general creditors (which is not an obligation described under subparagraph (D)).

> (D) ***Any obligation to shareholders or members arising as a result of their status as shareholder or members***.

*Id.* § 4617(c)(1) (emphasis added).  That priority scheme distinguishes between creditor claims (subsection (B)) and mere equity interests (subsection (D)).

*Conservatorship.*  As conservator, the FHFA is authorized to take actions both "necessary to put the regulated entity in a sound and solvent condition" and "appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity."  12 U.S.C. § 4617(b)(2)(D).  The entity, however, must pay any pre-existing obligations out of proceeds of operations in conservatorship.  *Id.* § 4617(b)(2)(H).  Unlike the receivership provisions, the conservatorship provisions include no priority scheme authorizing selective non-payment of debts.  Only once an entity is placed in receivership may the FHFA refuse to pay valid claims, and even then, only according to the priority scheme Congress enacted.

### III.    THE CHALLENGED RULE

#### A.    The Acting Director's Appointment Without Senate Confirmation

When the FHFA began operations in 2008, OFHEO Director James Lockhart became its

first Director under the Act's transitional provision.  Answer ¶ 28 (Doc. No. 15); AR 88.  Mr.

Lockhart placed Fannie Mae and Freddie Mac in conservatorship on September 6, 2008.  Answer

¶ 34; AR 336.  After Mr. Lockhart resigned in 2009, President Obama installed Deputy Director

Edward DeMarco as "Acting Director" without Senate confirmation on August 25, 2009, effec-

tive September 1, 2009.  Answer ¶¶ 8, 40; AR 339.  Mr. DeMarco has now served as Acting Di-

rector without Senate confirmation for more than two years and three months.  *See* Answer ¶ 8.

#### B.    The Notice of Proposed Rulemaking

The Act authorizes the FHFA to "prescribe such regulations as the Agency determines to

be appropriate regarding the conduct of conservatorships and receiverships."   12 U.S.C.

§ 4617(b)(1).  Invoking that authority, on July 9, 2010, the Acting Director proposed a rule de-

signed to limit the ability of defrauded stock purchasers to recover from Fannie Mae.  AR 1-11

(*Conservatorship and Receivership*, 75 Fed. Reg. 39,462 (July 9, 2010)).  Although the Act pre-

scribes a precise priority scheme for receivership in which creditor claims (including tort claims)

are paid before equity interests, 12 U.S.C. § 4617(c)(1), the Acting Director proposed that securi-

ties fraud claims be subordinated to the lowest level of priority in receivership, on par with ordi-

nary equity interests.  AR 4-6.  He also proposed to prohibit Fannie Mae from paying any securi-

ties fraud claims in conservatorship, absent the Director's consent.  AR 6-8.

Plaintiffs and their representatives opposed the rule.  AR 22-49, 82-89.  Several Members

of Congress did too.  AR 99-100 (Sens. Brown & Leahy); AR 117-18 (seven House Members).

Senators Brown and Leahy, for example, urged that "aggrieved pensioners should have the op-

portunity to pursue their claims [against Fannie Mae] in a court of law" and protested that the FHFA should not "determine the outcome of these claims."  AR 99-100.

### C.    The Final Rule

Despite that opposition, the FHFA adopted the challenged rule—signed by Acting Director DeMarco—as of June 20, 2011, with an effective date 30 days later.  AR 335-47 (*Conservatorship and Receivership*, 76 Fed. Reg. 35,724 (June 20, 2011)).  The FHFA stated that it had "considered all of the comments in developing the final rule" but that the "basic approach adopted in the proposed rule remain[ed] the same."  AR 337.

1.    The FHFA's final rule thus subordinates securities fraud claims to the lowest priority in receivership.  Under the revised scheme, claims are paid in the following order:

> (1) Administrative expenses of the receiver (or an immediately preceding conservator).
>
> (2) Any other general or senior liability of the regulated entity (that is not a liability described under paragraph (a)(3) or (a)(4) of this section).
>
> (3) Any obligation subordinated to general creditors (that is not an obligation described under paragraph (a)(4) of this section).
>
> (4) Any claim by current or former shareholders or members arising as a result of their current or former status as shareholders or members, ***including, without limitation, any securities litigation claim***.  Within this priority level, the receiver shall recognize the priorities of shareholder claims inter se, such as that preferred shareholder claims are prior to common shareholder claims. . . .

12 C.F.R. § 1237.9(a) (emphasis added).  The rule thus singles out securities fraud claims from other creditor claims and assigns them to the lowest priority level with mere equity interests.

The FHFA reasoned that the U.S. Treasury had invested public funds in Fannie Mae, and that the government deserved to recoup its equity investment before securities fraud victims were paid anything.  AR 337.  Payment of fraud claims, the agency urged, "would represent a wealth transfer from the taxpayers of the United States to certain current and former shareholders."  *Id.*

The agency did not explain why taxpayers who had not been defrauded and did not have valid tort claims against Fannie Mae deserved to be paid ahead of securities fraud victims with valid claims.  Nor did it explain why securities fraud victims should be treated less favorably than creditors with other tort or contract claims against the company.

Citing Section 510(b) of the Bankruptcy Code, the agency urged that "subordination is the rule in corporate bankruptcies."  AR 337-38.  Although Section 510(b) does not apply to receiverships, and there is no comparable provision in HERA, the FHFA asserted that there were "no sound reasons why the public policies supporting the rule in bankruptcy are not equally applicable."  AR 337.  "By permitting recovery by equity-holders only after creditors have been paid in full," it claimed, "this rule reflects the longstanding 'general rule of equity' that 'stockholders take last in the estate of a bankrupt corporation.'"  *Id.*

2.      To effectuate its priority scheme for receivership, the FHFA also prohibited Fannie Mae from paying securities fraud claims in conservatorship unless the Director specifically authorizes payment:  "The Agency, as conservator, will not pay a Securities Litigation Claim against a regulated entity, except to the extent the Director determines is in the interest of the conservatorship."  12 C.F.R. § 1237.13(a).  The rule also provides that "a regulated entity shall make no capital distribution while in conservatorship" without the Director's approval, *id.* § 1237.12(a), and defines "capital distribution" to include payment of securities fraud claims, *id.* § 1229.13(3).  The rule thus forbids Fannie Mae from paying securities fraud claims in conservatorship—even a judgment entered by this Court—absent the Acting Director's consent.

The FHFA identified no express statutory authority to single out particular claims for non-payment in conservatorship.   But it claimed that its generic charge "to restore a regulated entity in conservatorship to a sound and solvent condition" empowered it to "address" claims in

"the manner that it deems appropriate," such as by not paying them.  AR 338.  "[C]ourts," it contended, "are loath to require a conservator to make any particular expenditure."  *Id.*

The FHFA's rule sets forth no procedures the Acting Director would follow in determining whether to pay a claim.  Nonetheless, on October 7, 2011, Mr. DeMarco filed a declaration stating that he would not approve payment of any of Plaintiffs' claims.  Markovits Decl. Ex. O.  He advised that the "FHFA has determined that the payment of the claims in this case would not be in the interest of the conservatorship," that Fannie Mae "will not make a payment under the discretionary exception contained in 12 C.F.R. § 1237.13(a)," and that the FHFA "will not authorize a capital distribution to the plaintiffs."  *Id.* ¶¶ 4, 6.  Fannie Mae, he explained, would likely end up in receivership, and the United States as "preferred shareholder" was entitled to be paid before other equity interests.  *Id.* ¶ 4(b)-(d).  The FHFA provided no notice to Plaintiffs that the Acting Director would be making that determination.  Markovits Decl. ¶ 17.  It provided no opportunity to be heard.  *Id.*  Instead, the Acting Director filed the declaration in support of his motion to stay indefinitely the longstanding securities fraud litigation against Fannie Mae—a motion this Court denied.  Markovits Decl. Ex. P, Ex. Q at 3.

3.     The FHFA's rule only briefly addresses whether its Acting Director is serving in violation of the Appointments Clause.  AR 338-39.  The FHFA did not dispute that the Appointments Clause requires principal officers to be confirmed by the Senate.  U.S. Const. art. II, § 2.  And it admitted that Mr. DeMarco had been serving "without Senate confirmation" since September 2009.  AR 339.  According to the FHFA, however, "the U.S. Constitution [does not] require Senate confirmation for an official designated to serve in an acting capacity" and does not "limit[ ] the time period for which FHFA's Acting Director may serve."  *Id.*

## SUMMARY OF ARGUMENT

I.      Under the Appointments Clause, U.S. Const. art. II, § 2, principal officers must be nominated by the President and confirmed by the Senate.  That requirement supplies a critical check on presidential appointments, and helps ensure that officers entrusted to execute the laws do so in a manner that is fair, evenhanded, and consistent with the statutes Congress enacted. The rule at issue is invalid because it was promulgated by an agency whose head was not appointed as required by that provision.  Acting Director DeMarco is clearly a principal officer: He exercises significant authority subject to no oversight but the President's.  Contrary to the Appointments Clause, however, he has never been confirmed by the Senate.  Although courts and the Executive Branch have suggested that unconfirmed officers may serve as "acting" appointees *for brief periods*, Mr. DeMarco's two-year-plus tour as "Acting Director" far exceeds any plausible limit.  For that reason alone, the challenged rule is invalid.

II.     The FHFA's rule is also invalid because even properly appointed officers cannot promulgate rules that conflict with the statutes they administer.  By singling out securities fraud claims and subordinating them to the lowest priority in receivership, the FHFA's rule conflicts with the priority scheme in the Act.  In *Oppenheimer v. Harriman National Bank & Trust Co.*, 301 U.S. 206 (1937), the Supreme Court held that securities fraud claims must be treated as creditor claims in receivership unless Congress expressly provides for different treatment.  Nothing in HERA indicates that Congress departed from *Oppenheimer*.  To the contrary, the Act's history makes clear that Congress rejected subordination of securities fraud claims.  The FHFA's attempt to single out those creditors for arbitrary disfavor defies that statutory scheme.

III.    The rule's provisions barring payment in conservatorship are similarly invalid. The agency justified those provisions on the ground that they were necessary to give effect to the subordination scheme in receivership.  If that subordination scheme is unlawful, the conservator-

ship provisions must necessarily fall as well.  In any event, the Act does not permit the FHFA as conservator to single out valid claims for non-payment.  Congress intended that Fannie Mae continue to pay its bills in conservatorship as they become due.  If Fannie Mae cannot do so or if the FHFA does not want it to do so, Fannie Mae must be placed in receivership so its assets can be allocated according to the priorities Congress established.

IV.   The canon of constitutional avoidance confirms the rule's invalidity.  The rule violates Plaintiffs' due process rights by allowing the FHFA's Acting Director—with no prior notice or opportunity to be heard—to declare that he will not pay the securities fraud claims at issue in this case, retroactively eliminating the accrued causes of action of millions of defrauded investors.  The rule also violates separation of powers by granting an Executive Branch officer authority to defy federal court judgments.  And it violates the Takings Clause by effectively confiscating Plaintiffs' claims without just compensation.

## ARGUMENT

A court must grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-52 (1986).  Here, the undisputed facts entitle Plaintiffs to judgment on multiple grounds.  The challenged rule was promulgated by a putative agency head serving in violation of the Appointments Clause.  It attempts to revise HERA's express statutory priority scheme for receivership.  It purports to empower the Acting Director to single out securities fraud claims for non-payment in conservatorship, contrary to the Act's structure and intent.  And it raises serious constitutional questions.  In sum, the rule is not a permissible construction of the Act by a lawful officer, and cannot be upheld.

I.     **THE FHFA'S RULE IS INVALID BECAUSE THE AGENCY'S HEAD IS SERVING IN VIOLATION OF THE APPOINTMENTS CLAUSE**

Edward DeMarco has now been serving as "Acting Director" of the FHFA without Senate confirmation for over two years and three months, overseeing trillions of dollars of mortgage debt and a significant sector of the U.S. economy.  Because Mr. DeMarco holds office in violation of the Appointments Clause, he lacked authority to issue the challenged rule.

A.     **The Appointments Clause Requires Principal Officers To Be Confirmed by the Senate**

The Appointments Clause of the U.S. Constitution specifies in clear terms how officers of the United States must be appointed:

> [The President] shall nominate, and ***by and with the Advice and Consent of the Senate***, shall appoint . . . all . . . Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2 (emphasis added).

The Appointments Clause is "more than a matter of 'etiquette or protocol'; it is among the significant structural safeguards of the constitutional scheme."  *Edmond v. United States*, 520 U.S. 651, 659 (1997).  The appointment process it prescribes reflects a careful allocation of power between the Executive and Legislative Branches.  *Freytag v. Comm'r*, 501 U.S. 868, 878 (1991).  By vesting the President with the authority to ***nominate*** principal officers, the Clause "prevents congressional encroachment upon the Executive and Judicial Branches."  *Edmond*, 520 U.S. at 659.  But by subjecting nominees to ***approval by the Senate***, the Clause "serves both to curb Executive abuses of the appointment power and to promote a judicious choice of persons for filling the offices of the union."  *Id.* (citation, quotation marks, and alteration omitted).

As Hamilton explained, requiring the Senate's advice and consent provides "an excellent check upon a spirit of favoritism in the President, and . . . tend[s] greatly to prevent the appointment of unfit characters." *The Federalist No. 76*, at 529 (Henry B. Dawson ed., 1864). It prevents the appointment of "candidates who had no other merit than . . . being in some way or other personally allied to [the President], or of possessing the necessary insignificance and pliancy to render them the obsequious instruments of his pleasure." *Id.* at 530. The Clause, in short, was "designed to ensure public accountability." *Edmond*, 520 U.S. at 660; *see also Weiss v. United States*, 510 U.S. 163, 183-86 & n.1 (1994) (Souter, J., concurring).

By its terms, the Appointments Clause applies to all "Officers of the United States." U.S. Const. art. II, § 2. "[A]ny appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed" by that Clause. *Buckley v. Valeo*, 424 U.S. 1, 126 (1976). For "inferior officers," Congress can dispense with Senate confirmation and allow appointment by the President alone, courts, or department heads. U.S. Const. art. II, § 2. But "[p]rincipal officers [must be] selected by the President with the advice and consent of the Senate." *Buckley*, 424 U.S. at 132.

**B.     Mr. DeMarco Is Serving Without Senate Confirmation in Violation of the Appointments Clause**

Mr. DeMarco's service as head of the FHFA violates the Appointments Clause. Because Mr. DeMarco exercises "significant authority pursuant to the laws of the United States," he is clearly an "Officer[ ] of the United States." *Buckley*, 424 U.S. at 126. As the regulator of Fannie Mae, Freddie Mac, and the Federal Home Loan Banks, he wields broad powers over entities responsible for trillions of dollars in mortgage-related securities. *See* pp. 5-6, *supra*.

Mr. DeMarco is also a ***principal*** officer. The test for distinguishing principal officers (who must be Senate-confirmed) from inferior officers (who need not be) is straightforward:

14

"Whether one is an 'inferior' officer depends on whether he has a superior. . . . '[I]nferior offi-cers' are officers whose work is directed and supervised at some level by others who were ap-pointed by Presidential nomination with the advice and consent of the Senate." *Edmond*, 520 U.S. at 662-63; *see also Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3162 (2010). Accordingly, where an officer is accountable only to the President, he is a principal officer, and Senate confirmation is mandatory. *See Edmond*, 520 U.S. at 658-63.

Mr. DeMarco is clearly a principal officer under that standard. His work is not "directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond*, 520 U.S. at 663. To the contrary, he answers only to the President. *See* 12 U.S.C. § 4512(b)(2). Even that oversight is limited: The President can remove him from office only for cause. *Id.* Consequently, under the Appointments Clause, the Director is a principal officer who must be appointed by the nomination of the President, "by and with the Advice and Consent of the Senate." U.S. Const. art. II, § 2.

Mr. DeMarco's service as the FHFA's head violates those principles. As Defendants admit, "Mr. DeMarco has not been confirmed by the Senate." Answer ¶ 40 (Doc. No. 15); *see* AR 339. Instead, Mr. DeMarco "was **designated** Acting Director **by President Obama** on Au-gust 25, 2009, effective September 1, 2009, and has served in that capacity since then." Answer ¶ 8 (emphasis added); *see* AR 339. Mr. DeMarco had already been serving as "Acting" Director without Senate confirmation for 21 months when he signed the challenged rule. AR 335. He has now been serving without Senate confirmation for 27 months.

Mr. DeMarco's unconstitutional tenure in office requires that the challenged rule be struck down. "[O]ne who makes a timely challenge to the constitutional validity of the appoint-ment of an officer who adjudicates his case is entitled to a decision on the merits of the question

and whatever relief may be appropriate if a violation indeed occurred." *Ryder v. United States*, 515 U.S. 177, 182-83 (1995); *see also FEC v. NRA Political Victory Fund*, 6 F.3d 821, 828 (D.C. Cir. 1993).  Because Mr. DeMarco was not lawfully appointed, he had no authority to promulgate the challenged rule.  The rule cannot stand.

### C.   The Appointments Clause Cannot Be Circumvented by Designating an "Acting" Director Who Holds Office Indefinitely

In its rule, the FHFA admitted that it had been led by an Acting Director serving "without Senate confirmation" since September 2009.  AR 339.  But it deemed the absence of Senate confirmation irrelevant because "the U.S. Constitution [does not] require Senate confirmation for an official designated to serve in an acting capacity."  *Id.*  Nor, in its view, does the Constitution "limit[ ] the time period for which FHFA's Acting Director may serve."  *Id.*

The FHFA cited no authority for those extraordinary assertions.  Nor could it.  Allowing the President to appoint "acting" officers for indefinite periods would render the Appointments Clause a nullity:  The President could fill any position with an "acting" officer, bypass Senate confirmation, and leave that individual in office for the entire duration of his administration. There is no meaningful difference between a principal officer and an "acting" officer who performs the same duties indefinitely.  An "acting" officer like Mr. DeMarco exercises the same broad authority as a principal officer, and is subject to no greater supervision.  For that reason, courts and the Executive Branch have rejected the notion that "acting" appointments are exempt from the Appointments Clause.  While such appointments may be permissible ***for limited times***, Mr. DeMarco's 27-month service far exceeds any plausible limit.

1.    This Court has twice made clear that "acting" appointees can serve for at most brief periods—not the multi-year tenure at issue here.  In *Williams v. Phillips*, 360 F. Supp. 1363 (D.D.C. 1973), this Court addressed a challenge to the Acting Director of the Office of Econom-

ic Opportunity, whom the President had installed without Senate consent.  The Office's organic act required that it be "'headed by a Director who shall be appointed by the President, by and with the advice and consent of the Senate.'"  *Id.* at 1366 (quoting 42 U.S.C. § 2941(a) (1970)).  The government nonetheless urged that the President had inherent authority to make unilateral interim appointments.  *Id.* at 1368.  This Court rejected the government's position.  "[T]hat power," the Court stated, "if it exists at all, exists only in emergency situations."  *Id.* at 1369.

The government sought a stay from the court of appeals.  *See* 482 F.2d 669 (D.C. Cir. 1973) (per curiam).  It "concede[d] that the President cannot designate an acting officer ***indefinitely*** without any presentation to the Senate for confirmation," but urged the court to uphold that particular appointment.  *Id.* at 671 (emphasis added).  The court refused.  Although the President might have "an implied power . . . to appoint an acting director ***for a reasonable period of time***," the court explained, the President could not unilaterally install an acting director "for a period of ***four and a half months*** . . . without any nomination submitted for Senate consideration."  *Id.* at 670-71 (emphasis added).  An indication of the "reasonable time" for such appointments was the 30-day period the Vacancies Act then provided for certain temporary appointments (a statute by its terms not applicable there).  *Id.* at 671.  Because the acting director's four-and-a-half month tenure far exceeded that 30-day "reasonable period," the court denied a stay.  *Id.*

In *Olympic Federal Savings & Loan Ass'n v. Director, Office of Thrift Supervision*, 732 F. Supp. 1183 (D.D.C. 1990), *appeal dismissed as moot*, 903 F.2d 837 (D.C. Cir. 1990), this Court again recognized that an "acting" officer cannot serve indefinitely.  There, the President appointed an Acting Director of the Office of Thrift Supervision, purportedly pursuant to his authority under the Vacancies Act.  *Id.* at 1186.  After finding that statute inapplicable, *id.* at 1194-99, the Court cited *Williams* for the proposition that the President's inherent power to make act-

ing appointments, "if it exists at all, is limited," *id.* at 1199.  That authority did not apply there

because, among other things, "the government ha[d] not argued that any emergency existed be-

yond the general emergency which exists whenever a regulatory body charged with important

functions is left without its primary officer."  *Id.*  The Court thus found a "strong likelihood" that

the plaintiff would succeed and issued an injunction.  *Id.* at 1185, 1203.

      2.     The Executive Branch has repeatedly agreed that, under the Appointments Clause,

"acting" appointees can serve only for limited periods—even where a statute expressly author-

izes the appointment.  In 1977, the Office of Legal Counsel ("OLC") concluded that a Deputy

Director who becomes Acting Director of the Office of Management and Budget upon a vacancy

may not serve "indefinitely," even though the agency's organic statute authorizes the arrange-

ment, and even through "there is ***no express statutory limit on the length of such tenure*** as Act-

ing Director."  *Status of the Acting Director, Office of Management and Budget*, 1 Op. Off. Legal

Counsel 287, 287-89 (1977) (emphasis added).  OLC found it "implicit" in the statute that "a

Deputy Director may not properly serve indefinitely as Acting Director."  *Id.* at 289.  "There is

no specific limit, 30 days or otherwise, but the tenure of an Acting Director should not continue

beyond a reasonable time."  *Id.* at 289-90.  It elaborated:

> Pertinent considerations include the specific functions being performed by the
> Acting Director; the manner in which the vacancy was created (death, long-
> planned resignation, etc.); the time when the vacancy was created (*e.g.*, whether
> near the beginning or the end of a session of the Senate); whether the President
> has sent a nomination to the Senate; and particular factors affecting the Presi-
> dent's choice (*e.g.*, a desire to appraise the work of an Acting Director) or the
> President's ability to devote attention to the matter.

*Id.* at 290 (footnotes omitted).  Serving for three months was "reasonable" in that case, OLC

concluded, in significant part because the Senate had adjourned.  *Id.*

      Time and again, the Executive Branch has reiterated that "acting" appointees may serve

only for limited, temporary durations.  In 1978, OLC concluded that two temporary appoint-

ments for eight months were "reasonable" only because the officers' extended service was "due exclusively to delay in the confirmation process." *Department of Energy—Appointment of Interim Officers—Department of Energy Organization Act (42 U.S.C. § 7342)*, 2 Op. Off. Legal Counsel 405, 409-10 (1978). Two other temporary appointments for the same period were reasonable only because of the "difficulty of finding suitable candidates," the "uncertainties created by delays in the enactment of the pending energy legislation," and a one-month Senate recess. *Id.* at 410. In 1996, OLC surveyed its prior opinions and stated that it "would not currently view a ***four-and-a-half month*** temporary appointment as ***necessarily*** exceeding a reasonable duration, provided that a nomination is submitted to the Senate." *The Constitutional Separation of Powers Between the President and Congress*, 20 Op. Off. Legal Counsel 124, 163 (1996) (emphasis added). OLC "urged caution," however, "even when [there is] statutory authority to designate another official to serve in an acting capacity." *Id.* (emphasis omitted).

Finally, in 2003, OLC opined that the President could appoint a subordinate in the Office of Management and Budget to be temporary Acting Director pursuant to statutory authority. *Designation of Acting Director of the Office of Management and Budget*, 2003 WL 24151770 (O.L.C. June 12, 2003). That appointment was permissible only because the officer's limited tenure made him an "inferior officer" who could be appointed by the President alone under the Appointments Clause. *See id.* at *2. In *United States v. Eaton*, 169 U.S. 331 (1898), OLC explained, the Supreme Court held that an inferior officer could exercise the powers of a principal officer " 'for a limited time, and under special and temporary conditions.' " 2003 WL 24151770, at *2 (quoting 169 U.S. at 343).[1] OLC reiterated that, even where an acting appointment is au-

---

[1] In *Eaton*, a vice consul served for approximately ten months, but his tenure was justified by the fact that he was holding office in Siam after the consul became fatally ill, and the consul's successor had to travel across the globe to replace him. *See* 169 U.S. at 331-34 (statement of facts).

thorized by statute, the appointee can serve only "as long as is reasonable under the circumstances." *Id.* at *4 n.2.

3.      The FHFA's position that "the U.S. Constitution . . . [does not] limit[ ] the time period for which FHFA's Acting Director may serve" (AR 339) thus defies the prior rulings of this Court and the consistent views of the Executive Branch—views that are particularly noteworthy given the Executive Branch's natural incentive to expand the President's appointment authority.  Senate confirmation is a fundamental constitutional requirement designed to ensure that those selected to exercise the significant power of a principal officer—power that can be wielded to destroy private citizens' livelihoods or, as here, arbitrarily deny them recovery—will do so evenhandedly and consistently with the Legislature's design.  An "acting" agency head who exercises the same broad authority subject to no supervision but the President's for an indefinite period is, by definition, a principal officer under the Appointments Clause.

Because the FHFA concluded that "acting" appointees like Edward DeMarco can serve indefinitely, it made no effort to justify Mr. DeMarco's tenure.  That tenure—more than two years, three months, and counting—far exceeds any conceivable limit.  As a matter of sheer length, that tenure is extraordinary.  In *Williams*, the Court deemed a four-and-a-half month period excessive and suggested a 30-day benchmark.  482 F.2d at 670-71.  Although OLC has indicated that it "would not currently view a four-and-a-half month temporary appointment as ***necessarily*** exceeding a reasonable duration," 20 Op. Off. Legal Counsel at 163 (emphasis added), it has never approved anything remotely approaching Mr. DeMarco's tenure.  The appointments it has approved have been measured in months, not years.  *See* 1 Op. Off. Legal Counsel at 290 (three months); 2 Op. Off. Legal Counsel at 409-10 (eight months based on unusual circumstances).  Mr. DeMarco has exceeded even the 210-day limit in the current Vacancies Reform

Act several times over.  5 U.S.C. § 3346(a)(1).  His 27-month tenure is roughly half the five-year term he would serve if appointed *permanent* Director.  12 U.S.C. § 4512(b)(2).

The other factors the Executive Branch considers in determining "reasonableness" make the unreasonableness of Mr. DeMarco's multi-year tenure clearer still.  For example, while OLC considers the "specific functions being performed by the Acting Director," 1 Op. Off. Legal Counsel at 290, that factor weighs strongly against a finding of reasonableness.  As Acting Director, Mr. DeMarco wields extraordinary power over a crucial sector of the economy.  *See* pp. 5-6, *supra*.  And he is attempting to exercise that authority to deny millions of fraud victims any redress.  He has singled out securities fraud victims for disfavored treatment in defiance of a clear statutory mandate.  *See* pp. 24-41, *infra*.  And he has announced without any notice or opportunity to be heard that he will not allow Fannie Mae to pay Plaintiffs' claims, in connection with a motion for an indefinite stay of litigation that was itself an effort to frustrate those claims. *See* p. 10, *supra*.  The core purpose of Article II's Senate confirmation requirement is to ensure that individuals wielding the awesome powers of a principal officer serve the public interest evenhandedly and consistently with the statutes they administer.  Mr. DeMarco's ill-considered effort to deny equal treatment to defrauded investors who have been diligently pursuing legitimate claims for seven years raises precisely the sort of concerns the confirmation process is designed to address.[2]

The next factor—the "manner in which the vacancy was created (death, long-planned resignation, etc.)," 1 Op. Off. Legal Counsel at 290—also militates against a finding of reasonable-

---

[2] Another court has already expressed grave concerns about Mr. DeMarco's tactics.  In granting the FHFA leave to file a stay motion in another securities fraud case pending against Fannie Mae in the Southern District of New York, Judge Crotty wrote:  "It would be strange if Federal Housing Finance Agency ('FHFA') could adopt a rule frustrating the payment of any claims in this proceeding; but FHFA is entitled to make that motion, however unlikely it will be granted."  Markovits Decl. Ex. R at 1.

ness.  Mr. DeMarco's predecessor took office pursuant to a provision expressly denominated a "[t]ransitional provision," which provided that he would hold office only until "the date on which the Director is appointed and confirmed."  12 U.S.C. § 4512(b)(5).  The President thus had notice **on the face of the statute** that he needed to locate a replacement.

Nor has a Senate recess frustrated the President's ability to nominate a successor.  *See* 1 Op. Off. Legal Counsel at 290; 2 Op. Off. Legal Counsel at 409-10; 20 Op. Off. Legal Counsel at 163.  Mr. DeMarco's 27-month tenure has now spanned portions of three congressional sessions.[3]  Well over a year ago, the Chairman and Ranking Member of the Senate Banking Committee wrote to the President to note that "FHFA is without a permanent Director," urging that "a permanent Director should be appointed and confirmed."  Markovits Decl. Ex. S.  Although the President forwarded a nomination in late 2010—well over a year after Mr. DeMarco began his term—that nominee withdrew from consideration almost a year ago, and the President has yet to nominate anyone else.  Markovits Decl. Ex. T.[4]

The Framers included the Senate confirmation requirement as an important safeguard of individual liberties.  Mr. DeMarco has been serving in defiance of that requirement for over two years.  Because he was not validly appointed, the rule at issue must be set aside.

---

[3] Tellingly, OLC describes this factor as "the time when the vacancy was created (*e.g.*, whether near the beginning or the end of a session of the Senate)."  1 Op. Off. Legal Counsel at 290. That phrasing presumes that the acting appointee's tenure is short compared to a congressional session; the pertinent question is when **during the session** the vacancy occurs.  OLC apparently did not even conceive of the circumstance here—where the acting appointee remains in office for years on end, spanning multiple congressional sessions.

[4] The remaining OLC factors—"particular factors affecting the President's choice (*e.g.*, a desire to appraise the work of an Acting Director) or the President's ability to devote attention to the matter," 1 Op. Off. Legal Counsel at 290—are not implicated here.  Moreover, the President's inability to "devote attention to the matter" is not an appropriate justification for relaxing important constitutional constraints on his authority.

**D.    Mr. DeMarco's Designation Was Also Independently Invalid Because His Predecessor's Appointment Was Unconstitutional**

Mr. DeMarco is also serving unlawfully for a second reason:  His designation violated HERA because his predecessor was not validly appointed.  The Act allows the President to designate an Acting Director only "[i]n the event of the death, resignation, sickness, or absence ***of the Director***."  12 U.S.C. § 4512(f) (emphasis added).  That provision presumes there was a previous "Director," *i.e.*, a person validly serving in that office.  But Mr. DeMarco's predecessor, James Lockhart, was never validly appointed.  He took office under the transitional provision making "the person serving as the Director of [OFHEO]" the FHFA's new Director.  *Id.* § 4512(b)(5).  That mechanism violated the Appointments Clause.  Congress cannot appoint particular officers.  *See Buckley*, 424 U.S. at 126-33; 20 Op. Off. Legal Counsel at 153-54.  Yet that is what the transitional provision purported to do.  Because there was never any "Director" for Mr. DeMarco to replace, the statutory authority for Mr. DeMarco's appointment did not apply.

This Court reached precisely that conclusion on strikingly similar facts in *Olympic Federal*.  There, a transitional statute made the Chairman of the Federal Home Loan Bank Board the first Director of the new Office of Thrift Supervision.  732 F. Supp. at 1186.  When that individual resigned, the President designated an Acting Director pursuant to the Vacancies Act, which allowed him to fill a vacancy when "an officer of a bureau of an Executive department . . . dies, resigns, or is sick or absent."  5 U.S.C. § 3346.  The Court interpreted the term "officer" in that provision to mean a ***constitutionally appointed*** officer, so that the President could designate an acting replacement only if the predecessor was validly appointed.  732 F. Supp. at 1194-99.  Because the predecessor's appointment was invalid, the Vacancies Act did not permit appointment of an "acting" replacement.  *Id.* at 1199.  Mr. DeMarco's designation fails for the same reason.

## II.   THE RULE'S ATTEMPT TO REVISE THE STATUTORY PRIORITY SCHEME FOR RECEIVERSHIP IS UNLAWFUL

The FHFA's rule is also invalid on its own terms.  Under the Administrative Procedure Act, courts will uphold an agency's rule if it represents a "permissible construction" of an ambiguous statute.  *Chevron U.S.A., Inc. v. Nat. Resources Def. Council, Inc.*, 467 U.S. 837, 843 (1984).  But "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Id.* at 842-43.  In determining whether Congress has spoken directly to an issue, the Court must consider not only the statute's text, but also "traditional tools of statutory interpretation."  *Fin. Planning Ass'n v. SEC*, 482 F.3d 481, 492 (D.C. Cir. 2007); *see also Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 402-03 (D.C. Cir. 2004).

Here, the statute and Supreme Court precedent foreclose the FHFA's attempt to relegate the creditor claims of securities fraud victims to the lowest priority in receivership.  12 C.F.R. § 1237.9(a).  HERA prescribes a clear priority scheme under which creditors must be paid before equity interests.  Far from implementing that scheme, the FHFA's rule seeks to rewrite it, putting one group of creditors on par with mere equity interests.  Supreme Court precedent confirms that securities fraud victims must be treated like other creditors in receivership, not as mere equity interests, unless Congress directs otherwise.  Congress did not do so here.

### A.   *Oppenheimer* Requires Defrauded Investors To Be Treated As Creditors Unless Congress Expressly Provides Otherwise

The Act carefully distinguishes between creditor claims and equity interests in receivership, requiring the former to be paid before the latter.  "Unsecured claims against a regulated entity," it declares, "***shall*** have priority in the following order":

(A) Administrative expenses of the receiver.

> (B) ***Any other general or senior liability of the regulated entity*** (which is not a liability described under subparagraph (C) or (D)).
>
> (C) Any obligation subordinated to general creditors (which is not an obligation described under subparagraph (D)).
>
> (D) ***Any obligation to shareholders or members arising as a result of their status as shareholder or members.***

12 U.S.C. § 4617(c)(1) (emphasis added).  The FHFA's rule, however, replaces that statutory scheme with a different one:

> (1) Administrative expenses of the receiver (or an immediately preceding conservator).
>
> (2) Any other general or senior liability of the regulated entity (that is not a liability described under paragraph (a)(3) or (a)(4) of this section).
>
> (3) Any obligation subordinated to general creditors (that is not an obligation described under paragraph (a)(4) of this section).
>
> (4) Any claim by current or former shareholders or members arising as a result of their current or former status as shareholders or members, ***including, without limitation, any securities litigation claim***.  Within this priority level, the receiver shall recognize the priorities of shareholder claims inter se, such as that preferred shareholder claims are prior to common shareholder claims. . . .

12 C.F.R. § 1237.9(a) (emphasis added).  The rule's priority scheme thus singles out one and only one class of creditors—securities fraud victims—and subordinates their claims to the lowest priority level.  ***Any other tort victim*** would be paid pro rata with other creditors.  But defrauded investors are put at the back of the line, behind even preferred shareholders.

The FHFA's rule defies the statutory text and Supreme Court precedent alike.  The Act clearly distinguishes between creditor claims and equity interests, requiring the former to be paid before the latter.  12 U.S.C. § 4617(c)(1)(B), (D).  A securities fraud claim is a tort claim, no different from other creditor claims.  The agency cannot convert a tort claim into an equity interest merely because the victim happened to be an investor at some point.

*Oppenheimer v. Harriman National Bank & Trust Co.*, 301 U.S. 206 (1937), makes that clear.  In that case, the Supreme Court rejected the precise position the FHFA takes here, holding that securities fraud claims must be treated in receivership as creditor claims, not mere equity interests, unless Congress enacts specific language to the contrary.  *Oppenheimer* involved a purchaser of stock in a bank that had become insolvent.  *Id.* at 207-08.  The purchaser sued for rescission, claiming he had been defrauded into purchasing the stock by the bank officers.  *Id.* at 208.  The court of appeals ordered judgment for the plaintiff, but subordinated his claim to other creditors' claims.  *Id.*  The plaintiff sought review, and the Supreme Court unanimously reversed.

The Court described the issue before it as "whether plaintiff's judgment is entitled to share equally in the receivership estate with other unsecured creditors' claims."  *Oppenheimer*, 301 U.S. at 213.  It answered that question in the affirmative.  "The fraudulent sale was subject to rescission by the plaintiff," the Court explained, and the plaintiff "merely s[ought] to share in the estate as do other unsecured creditors."  *Id.* at 214.  That, the Court held, he was entitled to do:  Securities fraud victims "***stand on the same footing as other creditors***."  *Id.* at 215 (emphasis added).  And "[d]iscrimination against their claims is not authorized by the statute."  *Id.*  "It follows," the Court concluded, "that ***plaintiff's judgment is entitled to rank on a parity with other unsecured creditors' claims***."  *Id.* (emphasis added).

*Oppenheimer* is clear:  Unless subordination is expressly "authorized by the statute," securities fraud victims must be treated the same as other creditors in receivership.  301 U.S. at 215.  That rule was well established even before the Supreme Court ruled.  *See, e.g.*, *Richardson v. Olivier*, 105 F. 277, 280 (5th Cir. 1900) ("There is no sound reason, we think, for refusing to give a shareholder the same remedies against the bank on account of its frauds that are given to other creditors."); *Clark v. Boston-Cont'l Nat'l Bank*, 84 F.2d 605, 607 (1st Cir. 1936); *Salter v.*

*Williams*, 244 F. 126, 130 (3d Cir. 1917), *appeal dismissed*, 250 U.S. 653 (1919); *Williams v. Green*, 23 F.2d 796, 797-98 (4th Cir. 1928); *Fla. Land & Imp. Co. v. Merrill*, 52 F. 77, 80-81 (5th Cir. 1892).  And it has been reaffirmed many times since.  *See, e.g.*, *Kilpatrick v. Riddle*, 907 F.2d 1523, 1526 n.3 (5th Cir. 1990) (*Oppenheimer* "holds that bank stockholders defrauded into purchasing bank stock have the ***same priority after the bank fails as other unsecured creditors***" (emphasis added)); *SEC v. Ins. Investors Trust Co.*, No. 5753, 1971 WL 953, at *1-2 (W.D. Ky. Oct. 29, 1971) (citing the "specific pronouncements of *Oppenheimer* to the effect that ***[defrauded] stockholder claims rank on parity with unsecured creditors***" (emphasis added)).

*Oppenheimer* is fatal to the FHFA's rule.  Nothing in HERA authorizes subordination of securities fraud claims.  To the contrary, the Act clearly distinguishes between creditor claims and equity interests and reaffirms their traditional priorities.  12 U.S.C. § 4617(c)(1)(B), (D).  Because subordination is not "authorized by the statute," securities fraud victims "stand on the same footing as other creditors."  *Oppenheimer*, 301 U.S. at 215.  The FHFA's rule defies that statutory mandate by putting them at the back of the line instead.

The FHFA purported to justify its rule based on the "longstanding 'general rule of equity' that '***stockholders*** take last in the estate of a bankrupt corporation.'"  AR 337 (emphasis added).  But *Oppenheimer* makes clear that the "longstanding rule" for ***securities fraud victims*** is precisely the opposite:  They stand on par with other creditors unless different treatment is specifically "authorized by the statute."  301 U.S. at 213-15.  A court "will not assume Congress to have intended . . . a departure from well-established doctrine without a clear expression to disavow it."  *Dorszynski v. United States*, 418 U.S. 424, 441 (1974); *see also United States v. U.S. Gypsum Co.*, 438 U.S. 422, 437 (1978).  Congress is deemed to be "familiar with [the Supreme Court's] precedents . . . and [to] expect[ ] its enactment[s] to be interpreted in conformity with

27

them." *N. Star Steel Co. v. Thomas*, 515 U.S. 29, 34 (1995).  There is not the slightest indication

that Congress intended to depart from *Oppenheimer* here.

### B.    Bankruptcy Law Undermines the FHFA's Rule

Rather than follow Supreme Court precedent, the FHFA decided to try to "harmonize as-

pects of receiverships . . . with the bankruptcy regime that applies to most publicly traded corpo-

rations."  AR 337-38.  Since 1978, the Bankruptcy Code has contained a provision ***expressly***

subordinating securities fraud claims:

> ***For the purpose of distribution under this title***, a claim . . . for damages arising
> from the purchase or sale of such a security . . . ***shall be subordinated*** to all
> claims or interests that are senior to or equal the claim or interest represented by
> such security, except that if such security is common stock, such claim has the
> same priority as common stock.

11 U.S.C. § 510(b) (emphasis added).  The problem with the FHFA's reliance on that provision

is obvious:  Section 510(b) applies only "[f]or the purpose of distribution ***under this title***," *i.e.*,

in bankruptcies under the Bankruptcy Code, not receiverships under HERA.  *See Gaff v. FDIC*,

919 F.2d 384, 393 (6th Cir. 1990), *modified*, 933 F.2d 400 (6th Cir. 1991) ("[T]he Bankruptcy

Code does not govern bank failures."); *Office & Prof'l Emps. Int'l Union v. FDIC*, 962 F.2d 63,

68 (D.C. Cir. 1992) ("Bankruptcy Rules . . . do not govern of their own force in a FIRREA liqui-

dation.")*.*  However strong the FHFA's desire to "look[ ] to the U.S. Bankruptcy Code for guid-

ance," AR 338, the agency cannot rewrite the Act to revise the express priority scheme Congress

enacted by inserting a subordination rule Congress omitted.

Far from supporting the FHFA's position, Section 510(b) refutes it.  For over 70 years,

the law has been clear:  ***Unless*** subordination is expressly "authorized by the statute," securities

fraud victims must be treated the same as other creditors.  *Oppenheimer*, 301 U.S. at 215.  In

Section 510(b), Congress took up the Supreme Court's invitation to "authorize [subordination]

by the statute" in cases governed by the Bankruptcy Code.  That provision's plain text confirms

*Oppenheimer*.  It does not say that securities fraud claims "are" equity claims or otherwise disagree with *Oppenheimer*'s holding.  Instead, it simply directs that one particular class of creditor claims "shall be subordinated" in bankruptcy cases.  That language **presumes** that such claims are creditor claims; otherwise it would make no sense to speak of "subordinat[ing]" them.  If Congress had intended the FHFA to have similar subordination authority, it would have included comparable language in HERA.  It did not.

Before Section 510(b) was enacted in 1978, *Oppenheimer* applied across the board, in bankruptcies no less than receiverships.  *See, e.g.*, Memorandum for the Securities and Exchange Commission at 19 n.19, *Protective Comm. v. Anderson*, 390 U.S. 414 (filed March 1967) ("If [securities fraud] claims can be established, they are entitled to rank on a parity with those of other general unsecured creditors.") (Markovits Decl. Ex. U); *In the Matter of Four Seasons Nursing Ctrs. of Am., Inc.*, SEC Release No. CR-310, 1972 WL 129648, at *19 n.32 (Mar. 16, 1972) ("[F]raud claims are on parity with unsecured claims generally . . . .").  The House Report accompanying the 1978 amendments thus recognized that *Oppenheimer* "permits a rescinding security holder to share *pari passu* in the bankrupt estate with general creditors," and that "[t]he Supreme Court has not withdrawn from this position since 1937."  H.R. Rep. No. 95-595, at 194-95 (1978) (Markovits Decl. Ex. V).  The report further noted that the SEC had urged adhering to *Oppenheimer* because "a security holder who has been defrauded should be treated the same as any other tort victim."  *Id.* at 195-96.

When Congress revamped the Bankruptcy Code in 1978, it changed the rule for bankruptcy cases, relying largely on an influential 1973 law review article that advocated a new approach.  *See* H.R. Rep. No. 95-595, at 195-96 (citing John J. Slain & Homer Kripke, *The Interface Between Securities Regulation and Bankruptcy*, 48 N.Y.U. L. Rev. 261 (1973) (Markovits

Decl. Ex. W)); *see also In re Telegroup, Inc.*, 281 F.3d 133, 139 (3d Cir. 2002).  Section 510(b)

thus **changed** the law for bankruptcy cases.  *See In re Commercial Fin. Servs., Inc.*, 268 B.R.

579, 593 (Bankr. N.D. Okla. 2001); *In re Geneva Steel Co.*, 281 F.3d 1173, 1177 (10th Cir.

2002); Robert J. Stark, *Reexamining the Subordination of Investor Fraud Claims in Bankruptcy*,

72 Am. Bankr. L. J. 497, 505 (1998) (describing provision as a "paradigm shift").  Even the au-

thors of the 1973 article admitted as much.  *See* Slain & Kripke, *supra*, at 281 (noting the "con-

temporary learning that [defrauded] stockholders share *pari passu* with . . . general creditors");

*id.* at 285 (advocating a "reconsideration"); *id.* at 294 (outlining a "new approach").  But Section

510(b) expressly limits that change to cases governed by the Bankruptcy Code, and nothing—

absolutely nothing—evinces Congress's intent to depart from *Oppenheimer* here.

The FHFA insists that "a number of Federal circuit courts have looked to the U.S. Bank-

ruptcy Code for guidance on relative priorities of shareholder claims as well as other issues aris-

ing in receiverships of financial institutions."  AR 338.  But the only case it cites that actually

addresses "relative priorities of shareholder claims" is *Gaff v. FDIC*, 919 F.2d 384 (6th Cir.

1990).  *Gaff* has been rejected by **every other circuit** to consider the issue and rests on a demon-

strable error regarding Congress's intent.  *See* pp. 34-35, *infra*.  The other two cases the FHFA

cites have nothing to do with priorities.[5]  Neither remotely suggests that a bank receiver can

"look to" bankruptcy law to rearrange an express statutory priority scheme in violation of Su-

preme Court precedent.

---

[5] In *Office & Professional Employees' International Union*, the court looked to bankruptcy law
for guidance on whether a union could file claims on its members' behalf.  962 F.2d at 68.  In
*First Empire Bank–New York v. FDIC*, 572 F.2d 1361 (9th Cir. 1978), the court looked to bank-
ruptcy law to confirm the provability of contingent claims that were provable under general equi-
table principles regardless.  *Id.* at 1368.

Nor does *In the Matter of Stirling Homex Corp.*, 579 F.2d 206 (2d Cir. 1978), provide the FHFA any support.  There, the court subordinated securities fraud claims in bankruptcy based on the pending enactment of Section 510(b).  *Id.* at 212, 214-15.  But it expressly distinguished *Oppenheimer* as involving bank receiverships, not bankruptcies.  *Id.* at 211 n.8.  The FHFA's rule concerns a receivership, not a bankruptcy.  *Stirling Homex* thus undermines the FHFA's position.

The lesson of Section 510(b) is not that agencies can rewrite statutory priority schemes to conform to the Bankruptcy Code.  The lesson is that Congress knows how to depart from *Oppenheimer* when it intends to.  Congress could have added a provision in HERA that similarly subordinates securities fraud claims.  But the Act contains nothing remotely comparable to Section 510(b).  When Congress includes language in one provision but omits it from another, courts presume that "Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62-63 (2006) (quotation marks omitted); *see Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176-77 (1994).  The FHFA simply ignores that difference here.

### C.    The FHFA's Attempts To Distinguish *Oppenheimer* Fail

The FHFA attempted to rationalize its departure from precedent on the ground that "*Oppenheimer* is not controlling, fundamentally because it involved a receivership under a different statute."  AR 338.  But *Oppenheimer*'s holding is a general one:  Securities fraud victims must be treated as tort claimants, not mere equity interests, unless Congress provides otherwise.  Nothing in that holding turned on the details of the particular receivership statute at issue.  That is evident from *Oppenheimer*'s reliance on cases involving *different* statutes.  *See Oppenheimer*, 301 U.S. at 215 & n.15 (citing *Richardson*, 105 F. at 280).  And it is evident from the fact that *Oppenheimer* applied for decades in *bankruptcies*.  *See* pp. 28-31, *supra*.

31

Nor can the FHFA justify its departure from precedent on the theory that *Oppenheimer* "did not hold that . . . a statute must use 'magic words' to provide or allow for subordination." AR 338.  The problem here is not the absence of "magic words."  The problem is the absence of *any* words authorizing the agency to rewrite the statutory priority scheme.

Nor was "*Oppenheimer*'s holding . . . heavily dependent on the fact that the rescinding shareholder previously satisfied his statutory obligation to creditors under then-existing 'double liability' laws."  AR 338 (citing *Nw. Racquet Swim & Health Clubs, Inc. v. Resolution Trust Corp.*, 927 F.2d 355, 361 n.17 (8th Cir. 1991)).  *Oppenheimer* did mention that the defrauded shareholder had "fully paid his liability" under those laws (which made bank shareholders personally liable to depositors or other creditors for up to 100% of the par value of their shares, above and beyond their lost investment). 301 U.S. at 215.  But *Oppenheimer* mentioned that the plaintiff had paid his debts only because, had he not done so, that outstanding liability might have been a basis for treating him less favorably than creditors who did not owe money.  *See id.* at 214-15.  Here, the FHFA does not claim that Plaintiffs owe money to anyone, under "double liability" laws or otherwise.  The FHFA's attempt to limit *Oppenheimer* to cases involving "double liability" laws defies the case's reasoning—and the understanding of *Oppenheimer* that has prevailed for over half a century.  *See* pp. 26-31, *supra*.

### D.    The Act's History Confirms That Congress Did Not Intend To Authorize Subordination of Securities Fraud Claims

HERA's history confirms *Oppenheimer*'s applicability.  As Congress explained, HERA's "conservatorship and receivership provisions were modeled after similar provisions in the Federal Deposit Insurance Act," the statute empowering the Federal Deposit Insurance Corporation ("FDIC") to oversee insured banks.  H.R. Rep. No. 110-142, at 90 (2007) (Markovits Decl. Ex. X); *compare, e.g.*, 12 U.S.C. § 4617(a)-(b) *with id.* § 1821(c)-(d).  The FDIC's statute has long

been understood to preclude the sort of extra-statutory subordination the FHFA attempts here. By transplanting provisions from that earlier statute to HERA, Congress transplanted that understanding along with them.  *See Evans v. United States*, 504 U.S. 255, 260 n.3 (1992).

When Congress granted the FDIC receivership and conservatorship authority in the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183, it considered subordinating shareholders' claims against directors and officers of failed institutions to the FDIC's own claims.  A Senate amendment provided that, "[i]n any proceeding . . . against an insured financial institution's director, officer, employee, agent, attorney, accountant, appraiser, or any other party employed by or providing services to an insured financial institution, *any suit, claim, or cause of action brought by the Corporation shall have priority over any such suit, claim, or cause of action asserted by depositors, creditors, or shareholders of the insured financial institution*."  S. 774, 101st Cong., 1st Sess. § 214(o)(1) (1989) (emphasis added) (Markovits Decl. Ex. Y).  That amendment, however, was deleted from the bill.  *See* Pub. L. No. 101-73, 103 Stat. 183.

The amendment was rejected because it was "fundamentally unsound as a policy matter." 135 Cong. Rec. 18,571 (1989) (Rep. Glickman) (Markovits Decl. Ex. Z).  "[G]iving the FDIC an absolute priority [over securities fraud claims] would undermine fraud enforcement, would be potentially unfair to private plaintiffs who were innocent victims of wrongdoing, and would be at cross purposes with the thrust of the savings and loan legislation."  *Id.*  "[P]rivate parties would have little chance of recovery and as a result would no longer bring fraud suits," eliminating a "necessary supplement to the enforcement efforts of the SEC and the Department of Justice, which do not have the resources to enforce the law on their own."  *Id.*  "Because a priority would be a disincentive to private fraud suits and harm the enforcement scheme, it would lead to more

fraud and ultimately cost the taxpayers more money." *Id.* at 18,575 (Rep. Staggers).  And "[b]y leaving potential investors in savings institutions with no recourse if their investment was obtained by fraud or misrepresentation, a priority would discourage, not encourage, investment." *Id.*  In short, "the priority proposal on its face was manifestly unfair." *Id.*  The House conferees thus voted "overwhelmingly," "on a bipartisan basis," to delete the provision, and the Senate conferees agreed. *Id.*

Consistent with that history, three courts of appeals have refused to subordinate securities fraud claims under FIRREA.  In *FDIC v. Jenkins*, 888 F.2d 1537 (11th Cir. 1989), the Eleventh Circuit held that Congress's rejection of the subordination amendment "clearly refut[ed] FDIC's argument that it was the intent of Congress to grant the priority as contended by the FDIC." *Id.* at 1538 n.1.  "[A] decision to give the FDIC [subordination power]," it opined, "is more properly within the domain of Congress." *Id.* at 1541 n.6.  In *Howard v. Haddad*, 916 F.2d 167 (4th Cir. 1990), the Fourth Circuit followed suit, "expressly adopt[ing]" the Eleventh Circuit's analysis. *Id.* at 170.  The Third Circuit agreed in *Hayes v. Gross*, 982 F.2d 104 (3d Cir. 1992), citing Congress's decision to reject subordination on the ground that it was "unfair to victims of fraud" and would "impair the current enforcement scheme." *Id.* at 110 n.6.

The only contrary decision is *Gaff v. FDIC*, 919 F.2d 384 (6th Cir. 1990).  But *Gaff* has been harshly criticized and rejected by every other circuit to consider the issue.  *See Hayes*, 982 F.2d at 109 n.5; *Greenfield v. Shuck*, 867 F. Supp. 62, 69 (D. Mass. 1994).  Moreover, *Gaff* rests on a demonstrable error about Congress's intent.  The Sixth Circuit opined that FIRREA's "legislative history says ***nothing*** about why the Senate did not include" the subordination amendment and speculated that "the best explanation is that Congress thought it best that the law of priorities in bank receiverships should be developed by the federal courts on a case-by-case ba-

sis." 919 F.2d at 395-96 (emphasis added).  That is false:  The legislative history makes clear that Congress *rejected* subordination as unfair to fraud victims.  *See* pp. 33-34, *supra*.  Congress then incorporated that rejection into HERA when it modeled HERA on the FDIC's statute.

The FHFA cannot salvage its subordination rule by asserting that *Jenkins*, *Howard*, and *Hayes* "address the priority of FDIC claims against a failed bank's officers and directors relative to the claims private plaintiffs have against those same defendants" as opposed to "subordination of securities litigation claims in relation to competing creditors of an institution."  AR 338.  The issues are precisely parallel.  In *Jenkins*, *Howard*, and *Hayes*, the government receiver was trying to subordinate defrauded investors' claims so it could use the bank's assets to pay itself instead.  Likewise here, the FHFA seeks to subordinate defrauded investors' claims so it can use Fannie Mae's assets to pay the government instead.  The only difference is that, in *Jenkins*, *Howard*, and *Hayes*, the claims were against officers and directors, while the claims here are against the insti-tution itself.  But that difference cannot justify a different result.  Congress's concerns about the unfairness of depriving defrauded investors of redress do not depend on the defendant's identity. *See* pp. 33-34, *supra*.  The agency offers no response—because none exists.

### E.    The FHFA's Arbitrary Policy Arguments Cannot Redeem Its Rule

Invoking principles of "fundamental fairness," the FHFA insists that defrauded investors' tort claims should be treated "just as any other claim based on ownership of the security."  AR 337.  "Securities fraud claims in litigation," it asserts, "would not exist *but for* ownership of the underlying security."  *Id.* (emphasis added).  But securities fraud claims "do not . . . arise out of [the plaintiff's] status as . . . shareholder"; they arise out of "the allegedly fraudulent induce-ments to buy the stock."  *Howard*, 916 F.2d at 170.  Shareholders unaffected by the fraud, for example, have no claim.  And fraud victims may still have a claim even if they are no longer shareholders.  "Status" as a shareholder is thus not the basis for the claim.  The FHFA's "but for"

test also proves too much:  If a shareholder suffers a slip-and-fall injury due to the company's negligence while attending the annual stockholder's meeting, he is a tort victim with a creditor's claim, even though he would not have suffered the injury "but for" his status as a stockholder.  In any event, the agency's "but for" test is inconsistent with *Oppenheimer*, which is binding precedent whether the agency agrees with it or not.

The FHFA asserts that shareholders and creditors accept "different risk profiles."  AR 337.  But shareholders assume the risk of business failure, not fraud.  The FHFA never explains why pensioners who invested their life savings in reliance on the integrity of Fannie Mae's financial statements should be denied any recovery, while the government—which invested as a shareholder with full knowledge of the company's finances and the claims outstanding against it—should take priority.  "Fundamental fairness" requires that defrauded investors be treated on par with other creditors, not arbitrarily singled out for disfavor.  *See* Kenneth B. Davis, Jr., *The Status of Defrauded Securityholders in Corporate Bankruptcy*, 1983 Duke L.J. 1, 3-4 ("[A] rule of parity—that is, permitting securities law claimants to participate on a par with other unsecured creditor claimants—produces allocations that are better for public policy and fairer than the allocations produced by the subordination doctrine.").  OFHEO (the FHFA's predecessor) and the SEC have already collected multimillion dollar settlements based on their own fraud claims against Fannie Mae.  *See* p. 4, *supra*.  The FHFA nowhere explains why "fundamental fairness" requires that the ***actual victims*** of that very same fraud stand last in line.

The FHFA's "fairness" rationale thus could not sustain the rule even apart from its incompatibility with the statute and Supreme Court precedent.  Under the Administrative Procedure Act, the agency must engage in "reasoned decisionmaking."  *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998).  "Not only must an agency's decreed result be

within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id*.  The FHFA's unsupported appeal to "fairness" fails that test.  Because the FHFA's warped vision of fairness also conflicts with *Oppenheimer* and the statutory priority scheme, the rule must be set aside in any event.

## III.   THE RULE'S PROHIBITION ON PAYMENTS IN CONSERVATORSHIP IS UNLAWFUL

To make its subordination of securities fraud claims in receivership effective, the FHFA adopted complementary provisions barring payment of such claims in conservatorship absent the Director's consent.  12 C.F.R. §§ 1237.12(a), .13(a).  The Acting Director thus claims discretionary authority to refuse to pay valid claims—even a final judgment entered by this Court.  The Acting Director's effort to write that authority into the statute by regulation cannot be sustained.

### A.   The Prohibition on Payments in Conservatorship Falls Together with the Agency's Unlawful Subordination Scheme

Where one provision of an agency rule rests on another that is invalid, both must be vacated.  *See Solite Corp. v. EPA*, 952 F.2d 473, 493-94 (D.C. Cir. 1991); *Nat'l Mining Ass'n v. U.S. Dep't of the Interior*, 105 F.3d 691, 696 (D.C. Cir. 1997).  That is precisely the situation here:  When the FHFA proposed banning payments of securities fraud claims in conservatorship, it justified that prohibition as a corollary to its subordination of those claims in receivership.  "If the Conservator were to authorize payment of Securities Litigation Claims despite the statutory receivership priority system," the Acting Director stated, "the purpose of the receivership priority system could be thwarted, leaving fewer corporate resources to pay higher-priority claims during a subsequent receivership."  AR 7.

The Acting Director recently confirmed that connection in the declaration he filed in support of his motion to stay the securities fraud litigation.  The FHFA would refuse to pay the claims, he explained, because "[i]n a receivership, the United States as senior preferred share-

holder will have to be repaid in full before any other shareholders receive any value." Markovits Decl. Ex. O ¶ 4(d). Because the FHFA's prohibition on payments in conservatorship and its revision to the priority scheme in receivership are inextricably linked, the failure of either one to survive judicial review dooms the other as well.

### B. The Non-Payment Provisions Exceed the Agency's Authority and Arbitrarily Single Out Securities Fraud Claims

The prohibition on payment in conservatorship is also invalid in its own right. "Because [an agency] is a creature of statute, . . . [it] has only those authorities conferred upon it by Congress . . . ." *Transmission Agency of N. Cal. v. FERC*, 495 F.3d 663, 673 (D.C. Cir. 2007) (quotation marks omitted). An agency's actions must be set aside when, applying ordinary canons of construction, authority cannot reasonably be found in the statute. *See S.C. Pub. Serv. Auth. v. FERC*, 850 F.2d 788, 791-93 (D.C. Cir. 1988); *Transmission Agency*, 495 F.3d at 673-74.

Nothing in HERA authorizes the FHFA to select otherwise valid claims and single them out for non-payment in conservatorship. The Act carefully enumerates the FHFA's powers. *See* 12 U.S.C. § 4617(b)(2)(B), (D). They include generic authority to "operate the regulated entity," as well as authority to take actions that are both "necessary to put the regulated entity in a sound and solvent condition" and "appropriate to carry on the business of the regulated entity and preserve and conserve [its] assets and property." *Id.* § 4617(b)(2)(B)(i), (D). But Congress nowhere granted the FHFA authority to refuse to pay valid claims in conservatorship, much less defy judgments or court-approved settlements. Indeed, the Act expressly requires Fannie Mae to apply proceeds from operations in conservatorship to pay valid claims outstanding when it entered into conservatorship, such as Plaintiffs' securities fraud claims here. *Id.* § 4617(b)(2)(H).

The FHFA's contrary view—that it can pick and choose whom to pay—defies the general understanding of a conservator's powers. As a former Assistant Secretary of the Treasury

for Financial Institutions has explained, a conservator has "[no] statutory authority to require creditors to exchange debt for equity or to accept only partial payment of their claims." Richard Scott Carnell, *Handling the Failure of a Government-Sponsored Enterprise*, 80 Wash. L. Rev. 565, 613 (2005). "This conclusion follows from the terms of the conservator's authority: the statute granting the conservator 'the powers of the [regulated entity's] shareholders, directors, and officers' and the absence of any statute specifically authorizing the conservator to restructure or impair creditors' claims." *Id.* "Thus, if a [regulated entity's] assets fall short of its liabilities, the conservator lacks statutory power to resolve the shortfall." *Id.* at 613-14.

The FHFA's duty to pay valid claims in conservatorship is also apparent from the Act's structure. For receivership, Congress enacted a detailed priority scheme that prescribes which claims must be paid in what order. 12 U.S.C. § 4617(c)(1). But there is no comparable scheme for conservatorship. Congress surely did not intend the FHFA to adhere to a rigid priority scheme in receivership while picking and choosing among creditors without any statutory guidance in conservatorship. *See Burlington*, 548 U.S. at 62-63. If Congress had meant to grant the FHFA such authority in conservatorship, it would have enacted provisions governing its exercise, rather than leaving the agency free to pay whomever it sees fit.

The Act's provisions governing execution confirm that understanding. The Act states that "[n]o attachment or execution may issue by any court upon assets in the possession of the *receiver*, or upon the charter, of a regulated entity for which the Agency has been appointed *receiver*." 12 U.S.C. § 4617(b)(11)(C) (emphasis added). That provision thus suspends execution against entity assets during receivership. But there is no corresponding provision suspending

execution for conservatorship.[6]  Thus, even if the Agency refused to pay a securities fraud claim during conservatorship, the plaintiff could reduce his claim to judgment and use traditional means of execution to seize the entity's assets involuntarily.  Congress could not rationally have granted the FHFA authority to deny payment in conservatorship while simultaneously preserving creditors' right to execute against assets involuntarily.  The Act's execution provision thus confirms that Congress never granted the agency the power it asserts.

Finally, even if the FHFA had authority to refuse to pay claims in conservatorship, its decision to single out securities fraud claims was arbitrary.  The agency identified no basis for treating those claims less favorably than other tort or creditor claims, beyond its unsupported view that "fundamental fairness" requires them to be paid last.  AR 337.  As explained above, the agency nowhere explains why "fairness" requires that securities fraud victims be singled out and paid last while other tort victims and contract creditors recover on their claims.  *See* pp. 35-37, *supra*.  For that reason too, the rule must be set aside.

## C.      The FHFA's Contrary Arguments Lack Merit

The FHFA claimed support for its rule from its generic authority to "put the regulated entity in a sound and solvent condition."  AR 338 (citing 12 U.S.C. § 4617(b)(2)(D)(i)).  But that provision does not empower the agency to do ***whatever it pleases*** to promote Fannie Mae's solvency.  The FHFA's actions must be not only "necessary to put the regulated entity in a sound and solvent condition" but also "appropriate to carry on the business of the regulated entity and preserve and conserve [its] assets."  12 U.S.C. § 4617(b)(2)(D)(i)-(ii).  That two-part provision enables the agency to carry on the regulated entity's business in a way that promotes its sol-

---

[6] The FHFA argued in briefing on its unsuccessful stay motion that a different provision, 12 U.S.C. § 4617(j)(3), bars execution in conservatorship.  Markovits Decl. Ex. AA at 2-3.  But that provision by its terms applies only to "property *of the Agency*," *i.e.*, FHFA, not property of the regulated entity.  12 U.S.C. § 4617(j)(3) (emphasis added).

vency, not to pursue solvency by any means necessary.  It no more permits the agency to pursue solvency by flouting valid debts than it allows the agency to pursue solvency by printing money or operating a casino.  Besides, refusing to pay valid debts does not promote *solvency*; it exacerbates *insolvency* by increasing the amount the debtor owes.

The FHFA also urges that refusing to pay a valid judgment is not the same as "defy[ing]" a judgment.  AR 338.  But that argument makes no difference here:  The Act does not permit the conservator to refuse to pay valid obligations, whether reduced to judgment or not, and whether nonpayment makes the regulated entity a contemnor or merely a deadbeat.  *See* pp. 38-40, *supra*.  Finally, while the FHFA cites *Rosa v. Resolution Trust Corp.*, 938 F.2d 383 (3d Cir. 1991), that case merely held that an injunction directing payment would violate FIRREA's anti-injunction provision.  *See* 938 F.2d at 397-98.  It nowhere holds that a conservator can grant himself discretion to refuse to pay valid claims.

Ultimately, the Acting Director's effort to insert selective non-payment authority into his statutory conservatorship powers reflects a larger agenda—an effort to conflate his powers as *receiver* with his powers as *conservator*.  Unwilling or politically unable to place Fannie Mae into receivership, the Acting Director seeks to create his own personal priority scheme for conservatorship—one that allows him to pay off Fannie Mae's preferred shareholder, the government, while stonewalling victims of Fannie Mae's fraud.  Congress authorized impairment of valid claims *only* in receivership, and even then, only according to an explicit priority scheme designed to prevent arbitrariness or favoritism.  If Congress had wanted the Acting Director to exercise that authority in conservatorship, it would have said so, but it did not.  Because the Acting Director's effort to write that power into the statute defies the Act's text and structure, his rule cannot be sustained.

## IV.   PRINCIPLES OF CONSTITUTIONAL AVOIDANCE FORECLOSE THE FHFA'S RULE

Even if the FHFA's rule could be reconciled with the Act—and it cannot—it would still be invalid.  "[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems," the statute must be construed "to avoid such problems unless such construction is plainly contrary to the intent of Congress."  *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).  That "canon of constitutional avoidance trumps *Chevron* deference."  *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 711 (D.C. Cir. 2008); *see also Chamber of Commerce of U.S. v. FEC*, 69 F.3d 600, 605 (D.C. Cir. 1995).  Consequently, even where a statute is ambiguous, an agency interpretation that raises serious constitutional questions is not a permissible one.  For that reason too, the FHFA's rule must be set aside.

### A.   The Rule Violates Due Process

First, the rule violates the Fifth Amendment by retroactively depriving fraud victims of vested rights in accrued causes of action without due process.  Retroactivity is disfavored because it can "deprive citizens of legitimate expectations."  *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992).  The Supreme Court thus "give[s] careful consideration to due process challenges to legislation with retroactive effects."  *E. Enters. v. Apfel*, 524 U.S. 498, 547 (1998) (Kennedy, J., concurring in judgment).  The FHFA's rule violates those limitations because it attempts to deprive fraud victims retroactively of any redress for valid claims.  *See Bourgeois v. A.P. Green Indus., Inc.*, 783 So. 2d 1251, 1259 (La. 2001); *Resolution Trust Corp. v. Fleischer*, 892 P.2d 497, 500-07 (Kan. 1995); *cf. Crane v. Hahlo*, 258 U.S. 142, 147 (1922).

That due process violation is particularly glaring with respect to the provisions prohibiting payment in conservatorship without the Director's consent.  12 C.F.R. §§ 1237.12(a), .13(a).

"The essence of due process is the requirement that a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it." *Propert v. Dist. of Columbia*, 948 F.2d 1327, 1331 (D.C. Cir. 1991) (citing *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) (alterations and quotation marks omitted)). "[H]owever weighty the governmental interest may be in a given case, the amount of process required can never be reduced to zero—that is, the government is never relieved of its duty to provide *some* notice and *some* opportunity to be heard prior to a final deprivation of a property interest." *Id.* at 1332.

The Acting Director's rule granting himself discretion to refuse to pay valid securities fraud claims impermissibly reduces process to "zero." The rule provides no procedures governing the Acting Director's decisions about whether to pay or reject particular claims. Consistent with that omission, when Mr. DeMarco unilaterally announced that he will not pay Plaintiffs' claims under any circumstances during conservatorship, Markovits Decl. Ex. O, he gave no prior notice of that important determination to affected fraud victims. Nor did he afford them an opportunity to be heard. Instead, he simply announced his position in a declaration filed in support of his motion to stay the fraud litigation in this Court—a motion that was itself part of his campaign to frustrate Plaintiffs' claims. Markovits Decl. Ex. P, Ex. Q at 3. That sort of arbitrary action is the paradigm of a due process violation. Because the FHFA's rule allows the Acting Director to retroactively eliminate causes of action with "zero" process, the rule represents a particularly flagrant violation of due process.

### B. The Rule Violates Separation of Powers

The FHFA's rule also violates separation of powers. Judgments of Article III courts "may not lawfully be revised, overturned or refused faith and credit by another Department of Government." *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948). Thus, "Congress cannot vest review of the decisions of Article III courts in officials of the Ex-

ecutive Branch." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218 (1995).  The FHFA's rule violates those principles by granting its Acting Director—an Executive Branch officer—practically unconstrained discretion to repudiate federal court judgments.  The Acting Director can refuse to pay a judgment simply by determining it is not "in the interest of the conservatorship." 12 C.F.R. § 1237.13(a); *see also id.* § 1237.12(a).  That power to decide whether to honor or reject judgments is precisely the sort of authority an Executive officer may not exercise.

The FHFA seeks to avoid that problem on the theory that "not voluntarily writing a check to cover a money judgment . . . does not constitute 'defiance' or 'disregard' of that judgment." AR 338.  "'[T]he appropriate remedy,'" it asserts, "'is a writ of execution, not a finding of contempt.'"  *Id.*  But the FHFA fails to mention its position that Fannie Mae's assets are all immune from execution in conservatorship.  *See* Markovits Decl. Ex. AA at 2-3.  Where a plaintiff has been deprived of any means of enforcing a judgment, there is no meaningful difference between refusing to pay the judgment and nullifying it.

### C.  The Rule Violates the Takings Clause

Finally, the rule violates the Takings Clause by allowing the FHFA to take fraud victims' property rights in their claims while paying ***no*** compensation—let alone ***just*** compensation.  U.S. Const. amend. V.  "[C]laims for compensation are property interests that cannot be taken for public use without compensation."  *In re Aircrash in Bali, Indonesia on April 22, 1974*, 684 F.2d 1301, 1312 (9th Cir. 1982); *see also Greyhound Food Mgmt., Inc. v. City of Dayton*, 653 F. Supp. 1207, 1218-19 (S.D. Ohio 1986), *aff'd*, 852 F.2d 866 (6th Cir. 1988); *Edwardsen v. Morton*, 369 F. Supp. 1359, 1379 (D.D.C. 1973); *cf. Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982).  The government cannot deprive a person of "all economically beneficial uses" of his property without just compensation, *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992), or impair his property rights in a manner that unreasonably undermines le-

gitimate expectations, *see Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). The taking is particularly egregious here because the FHFA is not simply adjusting background principles of law for neutral reasons.  It is extinguishing private citizens' claims for the ***avowed purpose*** of transferring wealth to the U.S. Treasury.  AR 337; Markovits Decl. Ex. O ¶ 4(d).

\* \* \* \* \*

Because the challenged rule is unconstitutional, it cannot be sustained.  Even if there were some doubt, principles of constitutional avoidance would foreclose the FHFA's interpretation of its powers under the Act.  *See* p. 42, *supra*.

## CONCLUSION

Plaintiffs' motion for summary judgment should be granted.


Dated:  December 9, 2011

Respectfully submitted,

MICHAEL DeWINE
OHIO ATTORNEY GENERAL


|  |    /s/ Jeffrey A. Lamken     |
|---|---|
| Joseph T. Deters (admitted *pro hac vice*) | Jeffrey A. Lamken (D.C. Bar # 440547) |
| W.B. Markovits (admitted *pro hac vice*) | Robert K. Kry (D.C. Bar # 490545) |
| WAITE, SCHNEIDER, BAYLESS & | MOLO LAMKEN LLP |
|    CHESLEY CO., L.P.A. | The Watergate, Suite 660 |
| One West Fourth Street | 600 New Hampshire Avenue, N.W. |
| Cincinnati, Ohio  45202 | Washington, D.C.  20037 |
| (513) 621-0267 (telephone) | (202) 556-2000 (telephone) |
| (513) 621-0262 (facsimile) | (202) 556-2001 (facsimile) |

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OHIO PUBLIC EMPLOYEES<br>RETIREMENT SYSTEM, *et al.*<br><br>     Plaintiffs,<br><br>   v.<br><br>FEDERAL HOUSING FINANCE<br>AGENCY, *et al.*<br><br>     Defendants. | Civil Action No. 1:11-cv-01543 (RJL) |

## <u>PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

Pursuant to LCvR 7(h)(1), Plaintiffs submit this statement of undisputed material facts:[1]

1. Plaintiffs are Ohio state pension funds that have been appointed lead plaintiffs in a securities fraud class action currently pending against Fannie Mae in this Court.  Declaration of W.B. Markovits ("Markovits Decl.") ¶ 1.

2. The class that Plaintiffs represent in the securities fraud class action includes pension funds throughout all 50 States representing more than 30 million pensioners, as well as other individual investors.  Markovits Decl. ¶ 1.

3. The U.S. Attorney's Office, the Securities and Exchange Commission ("SEC"), and the predecessor of the Federal Housing Finance Agency ("FHFA"), the Office of Federal

---

[1] LCvR 7(h)(2) states that LCvR 7(h)(1) "shall not apply to cases in which judicial review is based solely on the administrative record."  Plaintiffs' complaint asserts causes of action under both the Administrative Procedure Act and the U.S. Constitution.  *See* Compl. ¶¶ 4, 73, 77, 81 (Doc. No. 1); *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3151 & n.2 (2010); *Ex parte Young*, 209 U.S. 123 (1908).  Accordingly, to ensure compliance with LCvR 7(h), in addition to the administrative record previously filed by Defendants, Plaintiffs submit this statement of undisputed facts potentially relevant to the constitutional claims.

Housing Enterprise Oversight ("OFHEO"), all investigated the fraud alleged in the securities class action.  Markovits Decl. Ex. C at 1-4.

4.     In September 2004, OFHEO released a report citing "concerns regarding the validity of previously reported financial results, the adequacy of regulatory capital, the quality of management supervision, and the overall safety and soundness" of Fannie Mae.  Markovits Decl. Ex. D at i.

5.     The SEC's Office of the Chief Accountant determined that Fannie Mae had violated accounting standards Fannie Mae itself had designated "critical" or "significant." Markovits Decl. Ex. E, Ex. F at 39-40, 126-127.

6.     Fannie Mae's Board of Directors commissioned former Senator Warren Rudman to head an independent investigation of Fannie Mae.  Markovits Decl. Ex. G at 1.

7.     Senator Rudman's report found that "management's accounting practices in virtually all of the areas that [he] reviewed were not consistent with GAAP, and, in many instances, management was aware of the departures from GAAP."  Markovits Decl. Ex. G at 4.

8.     Fannie Mae's Board of Directors promptly "accept[ed] and embrace[d]" the findings of Senator Rudman's report.  Markovits Decl. Ex. H at 2.

9.     In May 2006, OFHEO produced a final, lengthy report of its investigation of Fannie Mae.  Markovits Decl. Ex. I.

10.    The summary to OFHEO's May 2006 report states in part as follows:

- "Fannie Mae senior management promoted an image of the Enterprise as one of the lowest-risk financial institutions in the world and as 'best in class' in terms of risk management, financial reporting, internal control, and corporate governance," but "risks at Fannie Mae were greatly understated" and "the image was false."

- Fannie Mae's reported profit growth and achieved earnings targets "were illusions deliberately and systematically created by [Fannie Mae's] senior management with the aid of inappropriate accounting and improper earnings management."

- "A large number of Fannie Mae's accounting policies and practices did not comply with Generally Accepted Accounting Principles (GAAP)."
- Fannie Mae "had serious problems of internal control, financial reporting, and corporate governance."
- "By deliberately and intentionally manipulating accounting to hit earnings targets, senior management maximized the bonuses and other executive compensation they received, at the expense of shareholders."

Markovits Decl. Ex. I (summary page).

11.     In December 2006, Fannie Mae restated its financial results, reducing reported earnings by $6.3 billion.  Markovits Decl. Ex. C at 2.

12.     In its December 2006 restatement, Fannie Mae conceded that it had committed dozens of accounting violations and that its "misapplications of GAAP resulted in material modifications to [its] financial statements."  Markovits Decl. Ex. C at 74-87, 201-02.

13.     Fannie Mae has acknowledged that its accounting policies for "nearly every major accounting standard applicable to [its] mortgage financing business" were "not compliant with GAAP."  Markovits Decl. Ex. J ¶ 5 (emphasis omitted).

14.     Fannie Mae's restatement was "one of the largest financial restatements in U.S. corporate history."  Markovits Decl. Ex. K ¶ 10.

15.     On November 19, 2004, Plaintiffs filed suit against Fannie Mae and three of its senior officers in the U.S. District Court for the Southern District of Ohio.  *Ohio Pub. Emps. Ret. Sys. v. Fannie Mae*, No. 2:04-cv-01106 (S.D. Ohio).

16.     Claims arising out of Fannie Mae's fraud were consolidated in this Court.  *In re Fannie Mae Sec. Litig.*, Consol. Civ. No. 1:04-cv-01639 (D.D.C.).

17.     In the securities fraud class action pending in this Court, over 67 million pages of documents have been produced; 123 fact depositions and 35 expert depositions have been taken; and eight summary judgment motions have been filed.  Markovits Decl. ¶ 2.

18.     The securities fraud class action "has been regarded and referred to as the largest accounting fraud case in the history of the United States." Markovits Decl. Ex. L at 173.

19.     In 2006, the SEC filed a securities fraud lawsuit against Fannie Mae based on the same fraud alleged by Plaintiffs in the securities fraud class action. *SEC v. Fed. Nat'l Mortg. Ass'n*, No. 1:06-cv-00959 (D.D.C.).

20.     Fannie Mae paid the SEC a civil penalty of $350 million to settle the claims brought by the SEC, and paid OFHEO a further $50 million. Markovits Decl. Ex. M attach. 2, art. XI, at 14.

21.     Three of Fannie Mae's senior officers also paid settlements valued at over $30 million. Markovits Decl. Ex. N at 2.

22.     When the FHFA began operations in 2008, OFHEO Director James Lockhart became its first Director under the Housing and Economic Recovery Act's transitional provision. Answer ¶ 28 (Doc. No. 15).

23.     Mr. Lockhart placed Fannie Mae and Freddie Mac in conservatorship on September 6, 2008. Answer ¶ 34 (Doc. No. 15).

24.     After Mr. Lockhart resigned as FHFA Director in 2009, President Obama installed Deputy Director Edward DeMarco as "Acting Director" without Senate confirmation on August 25, 2009, effective September 1, 2009. Answer ¶¶ 8, 40 (Doc. No. 15).

25.     Mr. DeMarco has now served as Acting Director without Senate confirmation for more than two years and three months. Answer ¶ 8 (Doc. 15).

26.     On October 7, 2011, Mr. DeMarco filed a declaration stating that he would not approve payment of any of Plaintiffs' claims. Markovits Decl. Ex. O.

27.     Mr. DeMarco's October 7, 2011, declaration states that the "FHFA has determined that the payment of the claims in this case would not be in the interest of the conservatorship," that Fannie Mae "will not make a payment under the discretionary exception contained in 12 C.F.R. § 1237.13(a)," and that the FHFA "will not authorize a capital distribution to the plaintiffs."   Markovits Decl. Ex. O ¶¶ 4, 6.

28.     Mr. DeMarco's October 7, 2011, declaration states that Fannie Mae would likely end up in receivership, and that the United States government as "preferred shareholder" was entitled to be paid before other equity interests.  Markovits Decl. Ex. O ¶ 4(b)-(d).

29.     Mr. DeMarco gave no prior notice to Plaintiffs that he would not approve payment of any of their claims, and did not afford them an opportunity to be heard.  Markovits Decl. ¶ 17.

30.     In granting the FHFA leave to file a stay motion in another securities fraud case pending against Fannie Mae in the Southern District of New York, Judge Crotty wrote:  "It would be strange if Federal Housing Finance Agency ('FHFA') could adopt a rule frustrating the payment of any claims in this proceeding; but FHFA is entitled to make that motion, however unlikely it will be granted."  Markovits Decl. Ex. R at 1.

31.     On July 28, 2010, the Chairman and Ranking Member of the Senate Banking Committee wrote to the President to note that "FHFA is without a permanent Director," and urged that "a permanent Director should be appointed and confirmed."  Markovits Decl. Ex. S.

32.     Although the President forwarded a nomination in late 2010—well over a year after Mr. DeMarco began his term—that nominee withdrew from consideration almost a year ago, and the President has yet to nominate anyone else.  Markovits Decl. Ex. T.

33.     The FHFA has previously argued that Fannie Mae's assets are all immune from execution in conservatorship.  Markovits Decl. Ex. AA at 2-3.


Dated:  December 9, 2011                     Respectfully submitted,

                                             MICHAEL DeWINE
                                             OHIO ATTORNEY GENERAL


                                               /s/ Jeffrey A. Lamken
Joseph T. Deters (admitted *pro hac vice*)   Jeffrey A. Lamken (D.C. Bar # 440547)
W.B. Markovits (admitted *pro hac vice*)     Robert K. Kry (D.C. Bar # 490545)
WAITE, SCHNEIDER, BAYLESS &                   MOLO LAMKEN LLP
    CHESLEY CO., L.P.A.                       The Watergate, Suite 660
One West Fourth Street                       600 New Hampshire Avenue, N.W.
Cincinnati, Ohio  45202                      Washington, D.C.  20037
(513) 621-0267 (telephone)                   (202) 556-2000 (telephone)
(513) 621-0262 (facsimile)                   (202) 556-2001 (facsimile)